## ANNA EVANS v. WABASH RAILROAD COMPANY, Appellant.

### Division Two, July 13, 1909.

1. **NEGLIGENCE: Specific Allegations: Collision.** Where specific acts of negligence are stated in a petition, seeking to recover for the death of a fireman in a collision between trains, the plaintiff can recover only by proving the negligent acts specified.

2. **————: ————: ————: Not Looking: No Signals: Res Ipsa Loquitur.** Where a passenger train ran into a freight train standing still on the track, and plaintiff's husband, a fireman on the passenger train, was killed, and plaintiff in the summing up in her petition of the negligence theretofore generally charged, specifies three acts of negligence as the cause of his death, namely, (1) the failure of the engineer of the passenger train to keep a proper lookout, (2) his failure to observe the freight engine and train on the track, and (3) negligence of the crew of the freight train to give proper signals, and the court at plaintiff's request submits two of these acts of negligence to the jury, namely, failure to keep a lookout and failure to give the signals, and there is an entire failure of proof to sustain either, the verdict for plaintiff cannot stand. The rule of *res ipsa loquitur* does not apply where specific acts of negligence are charged.

3. **————: Master and Servants: Collision of Trains: Vis Major: Snow Storm.** Where there was a violent and unprecedented snow storm, local in its character, that could not have been foreseen or anticipated by the servants of defendant, so violent as to blow down seven or eight telegraph poles, so dense and fierce as to make it impossible for men to see a train on a straight track further than a quarter of a mile, and blowing in the face of the engineer, the snow and sleet that fell upon the engine turning into steam which fell over and around him, the wife of the fireman, who was killed when the engine ran into another which had been stopped by the falling poles, must show something more than the collision in order to recover; she must show that something defendant's servants did, or omitted to do, caused the accident.

4. **————: ————: ————: ————: ————: Flagging Train: Presumption.** And under such circumstances it will not be presumed that the flagman sent forward by the freight train conductor to flag the passenger train did not flag it, but it must be shown that he did not,

Appeal from Chariton Circuit Court.—*Hon. Jno. P. Butler,* Judge.

REVERSED.

*Geo. S. Grover* and *James L. Minnis* for appellant.

(1) Defendant was not the insurer of the safety of plaintiff's husband on the occasion here described. Turner v. Haar, 114 Mo. 346; 1 Labatt on Master and Servant, p. 306; Flori v. St. Louis, 69 Mo. 341; Fuchs v. St. Louis, 167 Mo. 621; Gulath v. St. Louis, 179 Mo. 38; Cox, Admr., v. Railroad, 102 Iowa 711; Stockwell v. Railroad, 106 Iowa 63; Kinzel v. Railroad, 137 Fed. 489. (2) The storm—an act of God—was the proximate cause of the death of Geo. W. Evans on December 12, 1903. For this result defendant was not responsible in damages to plaintiff. Authorities under point 1. (3) There was a complete failure of proof. For that reason defendant was entitled to a judgment in its favor. R. S. 1899, sec. 798; Bell v. Railroad, 72 Mo. 61.

*Willard P. Cave* for respondent.

(1) Defendant is liable for damages to agents or servants caused by the negligence of their fellow-servants. R. S. 1899, sec. 2873; Callahan v. Merchants Bridge & Ter. Co., 170 Mo. 473; Cambron v. Railroad, 165 Mo. 543. (2) This head-end collision occurred in the middle of the day on a straight track; the fact that it was snowing did not make this collision the act of God. Pruitt v. Railroad, 62 Mo. 527; Read v. Railroad, 60 Mo. 199; Vail v. Railroad, 63 Mo. 230; Haney v. City of Kansas, 94 Mo. 334; Hutchinson on Carriers, sec. 184; Wolf v. American Express Co., 43 Mo. 421; 1 Am. and Eng. Ency. Law (2 Ed.), 585, 587. (3) The proof was complete *res ipsa loquitur.*

There was not a scintilla of evidence of contributory negligence in the case. Shuler v. Railroad, 87 Mo. App. 618.

FOX, J.—This cause reached this court by appeal from a judgment in favor of Anna Evans, respondent, and against the Wabash Railway Company, appellant, rendered in the circuit court of Chariton county.

Respondent is the widow of George W. Evans, who was killed in a collision between a passenger train and a freight train, near the city of Brunswick, Chariton county, on December 12, 1903. The deceased was fireman on an engine, pulling passenger train No. 12 on appellant's railroad, which passenger train ran into freight train No. 91 about two miles east of Brunswick while said freight train was standing still, and which collision resulted in the death of said Evans.

The material portions of respondent's petition, or those parts which formulate the charges of negligence against appellant, are as follows:

"That on said December 12, 1903, between the hours of 11 and 12 o'clock in the forenoon of that day, the defendant, by its agents and servants, while running and operating its said locomotive engine and train of passenger cars at a point on defendant's said railroad about two miles east of the city of Brunswick, in the county of Chariton, in the State of Missouri, so negligently and carelessly ran and operated same that said locomotive engine and train of passenger cars ran into and collided with another locomotive engine and train of freight cars, being then and there operated by defendant; which said locomotive engine and train of freight cars were bound west and were being run to Kansas City, Missouri, and were then and there on the same track with said passenger train which was running east; that said freight train and engine attached to same were at the time

of said collision and for a period of twenty minutes prior thereto, standing still on defendant's said track at the point aforesaid, and the agents and servants of defendant then and there in charge of said locomotive engine and freight train attached thereto saw said passenger train approaching it and failed and neglected to sound the steam whistle on said freight engine and failed and neglected to give proper signals to said east-bound passenger train then approaching on said track, same being the main track; that said collision occurred on a straight track where the engineer on said passenger engine could have seen said freight engine and train for more than a mile by keeping a proper lookout ahead; that the engineer of said passenger engine and train failed and neglected to keep a lookout ahead and failed and neglected to see said freight engine and train standing on said track as aforesaid, when same could have been seen by him as aforesaid, and failed and neglected to stop said engine and passenger train, and so negligently and carelessly ran said engine that same collided with said freight engine and train of cars, and by reason thereof said passenger engine was wrecked and plaintiff's said husband, George W. Evans, was, while then and there in the service and employ of defendant, as aforesaid, and while engaged in the operation of defendant's said railroad, struck by the wreckage and by the coal on the tender of said passenger engine, being thrown with great force against him, the said George W. Evans, by reason of said collision, and he, the said George W. Evans, the husband of plaintiff, as aforesaid, was then and there, without fault or negligence on his part, instantly killed.

"That the death of plaintiff's said husband, George W. Evans, was caused by the carelessness and negligence of defendant's engineer running said passenger engine, in failing and neglecting to keep a proper lookout in front of his said engine, and in failing

and neglecting to observe the said freight engine and train standing on said track, and by the carelessness and negligence of the engineer and train crew of said freight train aforesaid, in failing and neglecting to give the proper signals to the engineer of said passenger engine in time to avoid said collision, thereby causing said collision and killing plaintiff's said husband, as aforesaid.''

The answer denies generally the allegations of the petition, pleads contributory negligence on the part of deceased, and then further answering ''defendant says that the death of plaintiff's husband, at the time and place stated in her petition, was solely the result of a sudden, unusual, unprecedented, unforeseen and extraordinary storm then and there prevailing on the line of the railroad of defendant, which rendered it impossible to prevent said injury and death.''

The record does not disclose the filing of a replication.

On December 12, 1903, freight train No. 91 going west on appellant's railroad, had, by proper order, until 11 o'clock a. m., to run to Brunswick and take siding for passenger train No. 12. By the order referred to passenger train No. 12, going east, could not leave Brunswick before 11 o'clock, but after that time, even though train No. 91 had not reached Brunswick, the passenger train held the right of way, and might proceed, regardless of No. 91. Train No. 91 had passed Dalton, a station about five miles east of Brunswick, and was proceeding to make said meeting point and clear for the passenger train in due time, when it was stopped about two miles east of Brunswick by eight or nine telegraph poles which had blown across the track by a very severe wind, sleet and snow storm which was then raging. Train 91 was a heavy freight and running slow. The engineer of the engine pulling this train discovered the poles and as he was running

only eight or ten miles an hour, stopped after running into at least one of them. This was about 10:45 o'clock a. m. Immediately after the train was stopped a flagman was sent to the rear to stop freight train No. 67, which he succeeded in doing; and as soon as the conductor of train 91 could get to the engine he dispatched brakeman Byers with a red flag and probably a torpedo, to Brunswick, with orders to flag and hold anything which might be coming. Byers left some twenty or twenty-five minutes before the collision occurred. The conductor, brakeman, engineer and fireman of train 91, a part of the crew of train 67, a track-walker and some farmers living near, had reached the point where the poles were down across the track and some were engaged in getting the poles off, when the form of passenger train No. 12 was discovered coming about a quarter of a mile away. This was about 11:05 a. m. At first it was thought to be an engine coming to help and as soon as it was discovered to be the passenger train, the conductor, brakeman and engineer of train 91 hallowed and gave the stop signals. At this time the wind was blowing severely and it was snowing very hard. The passenger train was running forty or forty-five miles an hour. No one on the engine appeared to notice the efforts made to signal them and the train never checked its speed until it struck train 91. The passenger train was going east, and the storm, an unprecedented wind and snow storm, was raging from the northwest. The smoke from the engine and steam caused by the falling snow on the boiler was blowing against the engineer's side, who sat on the right of the engine. Engineer Mathias, who was in charge of the passenger engine, says that the storm was not so severe when he left Brunswick, but that as he proceeded east it kept getting worse; that he could not see anything ahead of him, because of the sleet, wind, steam and snow; that he neither saw nor heard any signals and

knew nothing of the collision until it occurred. His engine knocked several telegraph poles off the track, but owing to the wind and noise of the storm and rapidity with which he was running, he did not know of these occurrences. The brakeman, Byers, did not testify, nor is there any evidence showing what, if anything, he did in the way of flagging No. 12. No showing was made as to why he was not produced as a witness, more than to show that he left the Wabash shortly after and was seen by one of the witnesses in Kansas City.

We will here collate the testimony on some of the principal questions to be considered in this cause.

The character of the storm:

Witness Millner, for respondent, and brakeman on No. 91, said: "The storm was so severe I don't suppose he could see us; there was no slacking of the speed of the passenger train." Says Byers had gone ahead to flag No. 12. "I didn't see him, the storm was so severe I couldn't see him." Says he discovered No. 12 "coming through the snow," there were nine poles across the track. "The storm was from the northeast; don't know how long the poles had been there; the storm blew them down." After passing Dalton, he says "the wind got stronger all the time; it seemed like the snow came in flurries, big bunches at a time, then it would lighten up a bit, and then come another flurry; a man could not see very clear then, but when it would rise a bit he could see further; that was the condition of things when we were at the point where these poles were down; if the dense clouds of snow had not been coming and going we could have seen No. 12 leaving Brunswick." Again, he says: "The smoke and steam from No. 12 was blowing back over the train; it was from northeast to southwest. Mr. Mathias was sitting on the right hand side of the

train, the south side; the storm would come right in
to his window; I did not see him; his train was run-
ning probably forty miles an hour; it only took him
a few seconds to come the distance from the time
we first saw him until he struck us; we saw his engine
in just about time enough to get out of the way." Fur-
ther he says: "The storm was a kind of a streak, it
come down through a streak of the country, in that
bottom; the storm was accompanied by a very severe
wind; just about the time they hit it had kind of check-
ed up, but a second or two before that there was a
big cloud went by; the snow kept us from seeing No.
12 coming a greater distance than a quarter of a mile,
it was so dense we could not see through it."

Conductor Allen on train No. 91 says there was
about nine poles down; says engineer of passenger did
nothing that he noticed to slack the speed of the train;
that the passenger train was running full speed when
the collision occurred.   "It was a pretty bad snow
storm.   Mathias in the cab, would be facing the snow;
the snow was blowing towards Mathias's engine as he
came down the track.   The poles were blown down
by the storm.   We first met the severe part of the
storm just about Dalton; it would slacken up and then
again it would come in a bluster and gale; the snow
would drift so you could hardly see at all; that sort
of snow was going on when he came to the wreck and
afterwards.   The storm must have kept him (Ma-
thias) from seeing us, and the snow was blowing
against him; the storm carried the steam and smoke
of his engine at a kind of an angle right back over
his engine, right in his face."   Says passenger en-
gine was running about forty miles an hour when it
hit engine of train 91.   Further said: "If his (Ma-
thias's) view had not been obstructed he could have
seen my signals; if the view had been clear, there
would have been no trouble."   Says the storm was
spotty, would be heavy and dark in one place and

light in another.   Says the wind was sufficient to blow down seven or eight telegraph poles.

R. C. Hardister, witness for respondent, testified: He was brakeman on train 67.   Was up at engine of train 91.   After discovering No. 12 through the storm had just time to get right off of way when the collision occurred.   Says there was. snow and sleet. and wind blowing, which obstructed his view of No. 12. "It was a pretty bad morning to start with, but it seemed as though the storm was worse in places than it was in others; it was pretty bad at the time of the collision."

W. C. Clifford, witness for respondent, conductor of train 67, said:   "The storm was about the severest at the time of the accident.   Suppose the storm caused the poles to fall; in ordinary weather you can see a long distance up that track; the storm was coming from the north and east; it would be in the face of the engineer of No. 12, and the storm and smoke of the engine would be in his face."

Harvey C. Noble, witness for respondent, and brakeman on train 67, said of the storm:   "I think it was about as bad as I have been out in; have been railroading five years; about the most severe I was ever in; it was storming from the time we went through Keytesville, but it wasn't so severe until we got to Dalton; it seemed to get worse then up to the time of the collision, till the time we stopped, and continued so; I know the storm was pretty fierce until noon."

Charles Hall, witness for respondent, and engineer on Wabash Railway, said:   "The snow was awful bad, and it was more ice than snow and it was cutting, snowing awful hard; that kind of a wind would blow smoke in the engineer's face; that would obscure his view.   There were times that morning in the storm that I couldn't see anything at all; I couldn't see the engine behind me nor the track ahead."   After the

collision he was sent out from Brunswick, where he had his engine, to the wreck. This was very soon after it happened. Says ''we were running slow, because we were going out to the wreck and we didn't know where it was, or what had transpired out there; when we picked conductor Allen up we were right into them, probably fifty feet, before I seen him; we were on the lookout for him. It was snowing so bad and blowing so hard; I was leaning out of the cab at the time." About a mile further he picked up conductor Cushwa of the passenger, but it had cleared some then and he discovered him easily.

Samuel Lewis, section hand, witness for respondent, said he was out all morning and that there were times he couldn't see much over three or four hundred feet, and then it would rise and he could see a half mile. Says when he was inside of a quarter from train 91 standing, he could not tell that it was a train or what it was.

Nicholas Mathias, witness for appellant, and engineer pulling train No. 12, testified that he had been engineer on the Wabash over thirty years. ''There was a severe storm that morning, as severe as I have ever seen since I have been railroading; it was snowing and the wind was blowing; I couldn't see at all; I was sitting against the snow, facing it, and I put my face out of the cab; I did not notice any telegraph poles blown down on that morning; did not either see or hear any poles being broken or blown down; I was going about forty miles an hour and the snow was coming towards me from the northeast and the wind was blowing a perfect gale; did not hear any torpedoes exploded; did not see any signals given by the other train nor hear any torpedoes. The storm was not so severe when I left Brunswick station; it began to snow east of the coal chute and kept on getting worse. The snow storm was right in that place and had been for some little time; I could see by the

way snow had been piled about there, but it was not bad when we left Brunswick, but it began to get worse and was a very severe storm. I never in all my experience on the Wabash saw as severe a storm as that one. I could not see on account of the storm and snow, although the track was straight there for several miles; the storm prevented my hearing the signals; I did not hear any torpedo on account of the wind blowing in my face and causing me to shut my eyes; I was running against the storm; if there were any signals given I did not hear them."

W. H. Holser, witness for appellant, who was the engineer in charge of engine pulling train 91, testified: "It was a very severe storm, about the worst I ever saw; we were about two miles east of Brunswick; it had been storming there, it commenced snowing when I left Keytesville, that is about eleven miles from Brunswick; it was not storming at Keytesville; we struck the unusual storm about three miles east of Brunswick; that is about a mile west of where the collision occurred; it was so severe you could hardly see anything, but just as luck would have it, before I came to where these telegraph poles were, we saw the poles blown down." Says he was only going eight or ten miles an hour. There were eight poles blown down. Says the storm was so severe that he could not see No. 12 very far. Further said: "I have never seen a snow storm as severe as that one on that part of the road. I would have cleared him five minutes but for this storm and the poles; it was impossible to see in that storm; you could not see far at all."

O. D. Blackwell, witness for appellant, fireman on train 91, said: "There was a severe storm that day; I call it a blinding snow storm. I never saw as severe a storm as that in that part of the country. The storm was raging at the time of the collision." Says when he saw No. 12 he could just discern a form

or shape through the cab window. First thought it was a light engine coming with men to clear away the poles.

### Was passenger train No. 12 flagged?

George Millner, witness for respondent, and brakman on train 91, said: "When I first saw the passenger train it was probably a quarter of a mile, coming down the track; we flagged the train; the storm was so severe I don't suppose he could see us; it kept coming ahead and collided with us; there was no slacking of speed of the passenger train. We gave signals with our hands and our hats, that is all we had to flag with; I don't know what Byers did. When we first saw it we gave the signal to stop and commenced flagging." Also says he thinks the track-walker flagged. "We saw his engine in just about time enough to get out of the way, and we waived our hats and hands to give the alarm."

Robert Allen, witness for respondent, and conductor of train 91, says: "The first thing I did was to send a flag out ahead, after I got on the engine; I sent a man by the name of Byers." Says he instructed Byers to go ahead to Brunswick and hold everything till they came and tell them what the trouble was. Says the last he saw of Byers he was going up the track about a quarter away; that was twenty or twenty-five minutes before the passenger came. Says that just before the collision he heard something coming; that he got on the south side of the track, started west and commenced waiving his hands and hollowing. Says Byers took a red flag with him as a danger signal. Says he does not know where Byers is now or where he lives; he left the Wabash shortly afterwards; had been gone ever since. Further said: "I did not neglect any precaution known to railroad service to protect and care for my engine; I sent a flagman each

way, armed with a flag and proper instructions; all I could do; nothing was left undone to protect my train.'' Says that in the use of torpedoes two are usually put down as a warning signal, and one is a signal to stop; they are placed on the rail on the engineer's side. He does not know whether there was any torpedoes on his train or not. Snow on the track would deaden the sound of a torpedo.

Engineer Hall, witness for respondent, said: ''There is no code signal to keep from being collided with that can be made by an engineer with his whistle; don't know of any such regulation. An engine going east forty miles an hour, and the wind blowing a perfect gale from the northeast, bearing snow and ice, and meeting the engine on the quarter, and there is smoke and steam escaping from the engine, blowing backward, that would obstruct the engineer's view; it would blow the steam right in his face and obstruct his view; the rate the engine was going would make it more severe; it wouldn't affect a man standing on the ground, but an engineer going forty or forty-five miles an hour wouldn't be able to see anything; he couldn't keep his head out.''

Samuel Lewis, witness for respondent, a track-walker, says the conductor and brakeman flagged No. 12, gave them the signal by waiving both arms and hands. Says he met Byers at a point just two miles from Brunswick going west on the track; this was about twenty-five minutes before No. 12 showed up.

Engineer Mathias, witness for appellant, said: ''I was going about forty miles an hour and the snow was coming towards me from the northeast and the wind was blowing a perfect gale; did not hear any torpedoes exploded; did not see any signals given by the other train nor hear any torpedoes.''

W. H. Holser, engineer on train 91, witness for appellant, says he saw Byers walking west on the track with a red flag; Byers claimed he had one torpedo.

Says when No. 12 showed up "my conductor and the hind brakeman and several·more gentlemen there, I don't recollect now, tried to stop him. They halloed and signaled, and I did too, but I seen the man couldn't see and didn't see us, and I got out of the way as far as I could; I gave him a stop signal; that was done with my hand. I noticed that he didn't see us when we signaled." Says both the conductor and brakeman flagged and tried to stop the train.

This substantially presents the testimony upon which this cause was submitted to the jury.

At the close of the evidence the defendant requested the court to give an instruction in the nature of a demurrer to the evidence, directing the jury to find the issues for the defendant. This request was denied, defendant properly preserving its objections and exceptions to the action of the court in denying such request. The court then proceeded, according to its views of the law, to instruct the jury upon all subjects to which the testimony was applicable. The cause was then submitted to the jury upon the instructions and evidence, and they returned a verdict finding the issues for the plaintiff and assessed her damages at the sum of five thousand dollars.

Timely motions for new trial and in arrest of judgment were filed and by the court taken up and overruled. From the judgment rendered in this cause the defendant prosecuted its appeal, and the record is now before us for consideration.

## OPINION.

The record in this cause assigns numerous errors as a basis for the reversal of this judgment; however, it is apparent that the main and controlling proposition confronting us is the challenge on the part of the appellant to the sufficiency of the evidence to authorize the submission of this cause to the jury. This

leading question was properly presented to the trial court by requesting an instruction at the close of the testimony on the part of the plaintiff as well as at the close of the whole case, directing the jury to find the issues for the defendant.   If this contention by the appellant that the testimony was insufficient to authorize the submission of the cause to the jury should be sustained, then it will not be necessary to consider the several other assignments of error why the judgment should not be permitted to stand.   We shall therefore first direct our attention to this main proposition.

In order to fully appreciate this important question it is essential that we make a brief reference to the issues as presented by the pleadings in the cause, to the end that we may give due effect to the testimony introduced upon those issues.   Respondent, by her petition, alleges in substance that on December 12, 1903, between the hours of 11 and 12 o'clock in the forenoon, the defendant, by its agents and servants, while running and operating a passenger train, so negligently and carelessly ran and operated same that said passenger train ran into and collided with a freight train; that said freight train was on appellant's tracks and had been standing still for twenty minutes; that the agents and servants in charge of said freight train saw said passenger train approaching and failed and neglected to sound the steam whistle; that said collision occurred on a straight track where the engineer on said passenger train could have seen said freight train for more than a mile by keeping a proper lookout ahead; failed and neglected to see said freight engine standing on the same track; failed and neglected to stop said passenger train, and so negligently and carelessly ran said engine that same collided with said freight engine and cars, and that by reason there-

of said passenger engine was wrecked and George W. Evans, deceased, husband of respondent, and fireman on said passenger engine, was killed.    Then follows these specific allegations in the petition: ''That the death of plaintiff's said husband, George W. Evans, was caused by the carelessness and negligence of defendant's engineer running said passenger engine, in failing and neglecting to keep a proper lookout in front of his said engine, and in failing and neglecting to observe the said freight engine and train standing on said track, and by the carelessness and negligence of the engineer and train crew of said freight train aforesaid, in failing and neglecting to give the proper signals to the engineer of said passenger engine in time to avoid said collision, thereby causing said collision, and killing plaintiff's said husband as aforesaid.''

The statements contained in the petition, as above quoted, are to be found at the close of plaintiff's petition, and it is manifest that these allegations were intended as a specific summary of the more general allegations which preceded them.    Obviously this summary of the general allegations embraced in the petition must be treated as the construction placed on such preceding allegations by the learned counsel who drafted the petition.    Upon this state of the pleadings it is clear that the plaintiff undertakes to charge as causes of the collision which resulted in the death of her husband, three distinct and specific acts of negligence, that is to say: First, The carelessness and negligence of appellant's engineer in charge of the passenger engine, in failing and neglecting to keep a proper lookout in front of his engine; second, The negligence of the engineer on said passenger engine in failing and neglecting to observe the freight engine and train standing on the track; third, The carelessness and negligence of the engineer and train crew of said freight train aforesaid in failing and neglect-

ing to give proper signals to the engineer of said passenger engine in time to avoid said collision.

Emphasizing the correctness of the conclusion that the trial court, as well as counsel for respondent, construed the cause of action as stated in the pleadings as being based on specific charges of negligence, it is only necessary to direct our attention to the instructions requested and given by the court on the part of the plaintiff. Instruction numbered 1 told the jury that if "George W. Evans was then and there crushed and killed, without fault or negligence on his part, and that the said collision and death of plaintiff's said husband was directly caused by the negligence of said engineer of said passenger engine, then and there in the employ of defendant, in carelessly and negligently failing to keep a lookout for signals, then your verdict must be for plaintiff." By instruction number 2 the jury were told that if George W. Evans was, while engaged in the service of appellant as fireman on said passenger engine, without fault or negligence on his part, crushed and killed, and that his death was directly caused by the carelessness and negligence of any of appellant's said employees in charge of said freight train number 91, whose duty it was to give signals to approaching trains, in negligently and carelessly failing to give to the engineer of the passenger train necessary and proper signals to stop in time to avert said collision, and that said collision and death of plaintiff's husband could have been prevented by the use of ordinary care and caution on the part of the aforesaid employees, then the verdict should be for respondent.

It is clear from these declarations of law given by the court as a guide to the jury in the consideration of the evidence, that this cause was tried upon the theory that the defendant was guilty of one or two specific acts of negligence, that is to say, first, the failure of the passenger engineer to keep a lookout ahead for

signals, or second, the failure of the crew in charge of train number 91 to give proper stop signals.

There is an entire absence from this record of any instructions based on any charge of general negligence contained in the petition.

Learned counsel for respondent for the first time during the progress of this cause by his brief filed herein invokes the doctrine of *res ipsa loquitur,* and in support of that theory directs our attention to the case of Shuler v. Railway Co., 87 Mo. App. 618. We have carefully analyzed that case and in our opinion it has no application to the case at bar. It will be observed that the Court of Appeals in that case, in announcing its conclusion, used this language: "It must therefore follow that since the company is liable to a servant, whether the negligence is its own or that of a fellow-servant, proof of collisions of trains makes a prima-facie case for an employee against the company, equally as well as if he had been a passenger." Upon an examination of the Shuler case it will be found that the petition did not base the cause of action upon specific acts of negligence, but simply alleged general negligence. There was not the slightest attempt in that case to specifically state the cause or causes of the accident, and the conclusions reached by the Court of Appeals were expressly predicated upon the ground that the petition stated only general negligence. That is not the case before us. It is plainly manifest that the petition in the record now under consideration is definite and specific in charging the particular acts of negligence which are alleged to have been the cause of the collision which resulted in the death of plaintiff's husband. This being true, it logically follows that if plaintiff is entitled to recover at all such recovery must be based upon the specific charges of negligence as contained in her petition.

In Beave v. Railroad, 212 Mo. 331, this division of

the court in treating of the proposition which is now urged by counsel for respondent in the case at bar, thus stated the rule: "The law is well settled in this State that a person will not be permitted to plead one cause of action and recover upon another. The respondent seeks to evade the operation of the above rule by contending that the petition in the case at bar is so broad in its charges of negligence that it is equivalent to an averment of general negligence, which is a sufficient allegation in cases like this; that is, that plaintiff would have made a prima-facie case by merely alleging and proving that he was a passenger, that the collision occurred, and that he was injured in consequence thereof. As an abstract proposition of law that contention is sound, and if the petition had been drawn upon that theory, then the instruction in this case would have been a correct declaration of law. But that rule has no application where the petition, as in this case, alleges the specific acts of negligence relied upon for a recovery. . . . The reason of this rule is apparent. Charging the specific acts of negligence relied upon for a recovery is equivalent to stating that there are no other acts of the company which caused or contributed to the injury; and, if after stating his cause of action, the plaintiff is permitted to introduce evidence of and recover upon another and different cause, not stated in the petition, the defendant would thereby be taken by surprise and would not be prepared to meet the new issues thus presented." "But," as said in the case of Roscoe v. Railroad, 202 Mo. 576, "if plaintiff by his petition is shown to be so sufficiently advised of the exact negligent acts causing or contributing to his injury, as to plead them specifically, as in this case, then the reason or the doctrine of presumptive negligence has vanished. If he knows the negligent act, and he admits he does so know it in his petition, then he must prove it, and if he recovers it must be upon the negligent

acts pleaded and not otherwise. In other words the burden of proof is upon plaintiff as it would be in any other kind of a case.''

I. This leads us to the consideration of the evidence developed upon the trial of this cause.

In considering the evidence offered to establish the acts of negligence relied on we must bear in mind that just before and at the time of the accident a very unusual and extraordinary snow and wind storm was raging. This storm is assigned by appellant as the cause of the death of Evans. It is not claimed by appellant that the accident was due to an ''act of God'' in the strict interpretation of that phrase, but rather that it was due to the doctrine involved in the phrase ''Vis Major,'' which is defined to be an irresistible natural cause which cannot be guarded against by the ordinary exertions of human skill and prudence. [29 Am. and Eng. Ency. Law, 1064.]

The facts developed concerning the storm that was raging at or about the time of this accident are practically undisputed, and the evidence clearly shows that the snow and wind storm which was raging at the time of the collision was of a most extraordinary and unprecedented character in that locality. There are no contradictions upon this subject among the witnesses. Every witness who testified gave it that character. It was such a storm that could not reasonably have been anticipated by the agents, servants and employees of the appellant. The description of that storm by the numerous witnesses testifying in this cause in reference to its local character renders it most extraordinary and peculiar.

In Turner v. Haar, 114 Mo. 335, the plaintiff Turner sought to recover damages for injuries received by reason of the falling of a building in which he was at work. The defense interposed to that action was that the building was destroyed by a violent and

unprecedented storm. Judge MACFARLANE, speaking
for this court, very clearly and correctly announced
the proper rule as applicable to this subject. Among
other things he said: ''While there is no doubt that
defendants owed to plaintiff, as one of their employees,
the duty of care in supplying her a safe place in which
to work, it is equally well settled that a master is not
required to provide against storms, extraordinary and
unprecedented in their character, in that locality, but
only for such as could reasonably have been antici-
pated. . . . If the injury is shown to have result-
ed from a condition which is extraordinary and not to
be expected, it is not enough simply to prove an injury
to plaintiff. Something that the defendants did, or
that they omitted to do, must be proved to have been
the cause of the injury.'' While in the Turner case
there was no specific assignment of negligence, yet the
court held that where a building was destroyed during
the prevalence of an unprecedented storm, the destruc-
tion of the house would be attributed to the storm,
and the prima-facie case made by the falling of the
building would thus be rebutted.

Mr. Labatt, in his work on Master and Servant,
vol. 1, p. 306, makes the following clear and pertinent
observations: ''A principle frequently  applied is,
that in certain states of the evidence a court is enti-
tled to declare, as a matter of law, that the catastro-
phe in question, though a natural and possible result
of the conditions which existed, was so 'rare and pe-
culiar,' or so far 'outside the range of ordinary ex-
perience,' or 'out of the common course,' that the
master could not reasonably be expected to conduct
his business in such a manner as to eliminate the risk
of its occurrence. His non-liability is assumed to be
a conclusive inference from the principle that 'ordi-
nary care does not require that every possible contin-
gency must be anticipated and guarded against, but
only such as are liable to occur.''

Upon the trial it was developed by the evidence introduced on the part of the plaintiff that the storm of wind, sleet and snow was raging violently from the northeast and blew down and across the track eight or nine telegraph poles just a short time before the collision; that freight train number 91 was stopped by those poles and that immediately thereafter the conductor did what was usual on such occasions and started flagmen each way with instruments to stop everything. Passenger train No. 12, upon which plaintiff's husband was a fireman, was due at Brunswick about 11 o'clock. This was a passenger train and had the right of way, and having no orders to the contrary had the undoubted right to pull out of Brunswick and proceed on its journey east, in the direction of freight train No. 91. Immediately after leaving Brunswick the storm increased. The engineer, pulling the passenger train No. 12, nor the fireman on said train, facing the smoke, snow and wind could not see anything ahead of them. This train had passengers aboard and the conductor, engineer and the crew operating same could not afford to stop it, because of the danger of being run into either in front or behind; hence the only appropriate thing they could do, being a passenger train and having the right of way, was to proceed. The evidence on the part of the respondent further shows that by reason of the density of the snow and the terrible wind and storm that was raging the crew of train No. 91 did not discover the approach of passenger train No. 12 (and then could only discover a mere form) until it was within seven or eight telegraph poles of No. 91. The evidence as to how this collision occurred is fully set out in the statement of the facts of this cause, and it was under the circumstances as detailed in such statement that this collision occurred.

The primary showing made by respondent's evidence was that the collision was due to the extraordi-

nary and unprecedented snow and wind storm then prevailing, Therefore, this being true, it then devolved upon respondent to prove one or both of the acts of negligence submitted to the jury by instructions Nos. 1 and 2; that is to say, she must have shown that the collision was due to the failure and neglect of engineer Mathias to keep a proper lookout ahead for signals, or, to the failure and neglect of any of the crew in charge of train 91 to give the necessary and proper signals to engineer Mathias to stop his engine and the passenger train. As to whether there is any evidence in the record tending to establish either or both of said propositions will be our next inquiry.

Does the evidence show that engineer Mathias failed to keep a proper lookout ahead for signals? There is absolutely no direct or positive evidence of any failure or default on the part of Mathias, more than he did not check or stop his train when signaled by the crew of train 91. He says he saw no signals nor heard any torpedoes. Says he could not see ahead, nor keep his head out the side window at the rate of speed he was going. He was going east and was sitting on the right or south side of the engine; the wind, snow and sleet from the northeast, as well as the smoke and steam from his engine, absolutely obscured his view and prevented him seeing anything ahead. Engineer Hall, who ran his engine slowly out to the wreck shortly after, and who kept his head out all the way, says he was within fifty feet of Conductor Allen before he could see him. Says he could not have kept his head out had he been going forty-five miles an hour as Mathias was. Those at the head of train No. 91, standing with their backs to the wind, did not discover, nor could they see train No. 12 on a track, which is straight for miles, until it was within a quarter of a mile of the freight engine. They could then only discern a form approaching through the blinding snow. After reading and rereading the

testimony carefully we see no escape from the conclusion that there is no testimony tending to show that Engineer Mathias negligently failed to keep a proper lookout ahead for signals. That he was not looking out ahead is quite clear, but that he could not do so because of the extraordinary severe wind and storm then raging, is equally clear. It must be remembered that the storm was not so violent when he pulled out of Brunswick but kept getting worse as he proceeded. It was evidently of a local character and reached a climax of severity at about the point of the collision. It must have been of a most *"rare and peculiar"* character and *"out of the common course"* to have blown down eight or nine telegraph poles within a distance of about a quarter of a mile. Owing to its local and severe character it could not reasonably have been anticipated by appellant's agents in time to have averted the catastrophe.

II. This brings us to the consideration of the question as to whether or not there was a negligent failure on the part of any of the employees of appellant in charge of freight train No. 91, who were charged with the duty of giving signals to approaching trains, to give the necessary and proper signals to Engineer Mathias to stop his engine and said passenger train.

Respondent's own testimony developed that at once upon train No. 91 being stopped by the fallen telegraph poles, Conductor Allen, in charge of that train, caused Brakeman Millner to go back east with a red flag and Brakeman Byers to proceed west with a red flag. His instructions to Byers were to stop everything and to go on to Brunswick, which was about two miles away, and report the fallen poles. As soon as passenger train No. 12 was discovered approaching, Conductor Allen, Engineer Holser, in charge of engine pulling train No. 91, Brakeman Millner, who had gone to the front of his train after flag-

ging freight train No. 67, all signaled the engineer of train No. 12 with their arms and hats and halloed at him. In fact, it is shown by respondent's evidence that the members of the crew of freight No. 91, who were at or near the engine, did everything in their power to signal the approaching train. It is true that the whistle on the freight engine was not blown, but it was not shown that the sounding of that whistle would have been any more effective than the signals which were given. Under the circumstances, Engineer Mathias going at a speed of forty miles an hour, surrounded as he was by the noise of the storm and working engine, it is not at all likely that the sound of the whistle on the freight engine would have reached him. Thus far the allegation that the members of the crew running and operating freight train No. 91 were negligent in failing to signal appellant's passenger engineer, is not only not proven, but the uncontradicted evidence shows that they acted promptly and used every available means to stop the passenger train.

But, respondent says, the negligence of Byers, the brakeman sent ahead by Conductor Allen, was palpable. Learned counsel for respondent argues as follows: "He left the place where train No. 91 stopped, knowing that the passenger train was soon due. He had half an hour to go a scant mile and a half, with the wind at his back. He was instructed to go to Brunswick and hold everything there until 91 got there. He had ample time to reach the coal chute east of Brunswick where the passenger train stopped and took coal. His failure to do his duty was negligence that directly contributed to the collision."

The record discloses that Byers did not testify, nor is there any testimony showing what he did before reaching Brunswick and informing Engineer Hall of the wreck. What he did can only be surmised

by inference. That he did not reach Brunswick before the passenger train left may be inferred from the information he gave Engineer Hall. That the passenger train passed him on the way may be inferred from the fact that he knew there was a collision. It might be inferred that he concluded the trains would collide from the fact that owing to the severity of the storm he was unable to communicate a signal to Engineer Mathias. But as already pointed out this case cannot be determined by inference or presumptions. It cannot be presumed from the fact of the collision that either Byers or Mathias were derelict in the duty alleged. The burden was on respondent to show that Byers failed to give the proper signals, and in this there is a complete failure of proof. Byers may have had torpedoes and may have placed them on the track, or he may not; he may have used his red flag and attempted to signal the engineer, and he may not. With this extraordinary and unprecedented storm raging, the mere fact of a collision is not sufficient proof that Byers, the flagman, failed to discharge his duty. We repeat, that the burden was upon plaintiff to show, under the conditions existing at the time of the accident, that he failed to discharge the duty imposed upon him. The conclusion that Byers did not give the signals can only be reached by a surmise alone, and when the evidence in its entirety, as given by the engineer and all the other witnesses, is considered, it is just as reasonable, if not more so, to conclude that Byers did give the signals, and that owing to the unprecedented storm they were not seen, as to conclude that he failed to give them.

In our opinion it is clear that the plaintiff sought a recovery for the death of her husband predicated upon charges in her petition of specific acts of negligence on the part of the defendant. This being true, the burden rested upon her to prove by substantial testimony the specific acts of negligence charged in

her petition. We have carefully read in detail the evidence as disclosed by the record in this cause, and in our opinion there was a failure to prove the acts of negligence or any one of them alleged in the petition, hence it was the duty of the trial court to have granted the request of the defendant and directed the jury to find the issues for it.

We have indicated our views upon the controlling proposition in this cause, which results in the conclusion that the judgment of the trial court should be reversed. All concur.