FILIPPO RIBELLO, RESPONDENT, v. CHICAGO, BURLINGTON AND QUINCY RAILROAD COMPANY, A CORPORATION, APPELLANT.—176 S. W. (2d) 670.

St. Louis Court of Appeals. Opinion filed January 4, 1944.

*J. A. Lydick* and *Douglas W. Robert* for appellant.

*Anthony Canzoneri* and *Echeal T. Feinstein* for respondent.

SUTTON, C.—This is an action to recover damages for the negligence of the defendant in the construction and maintenance of a culvert under its roadbed at or near Bissell Station in St. Louis County, whereby, it is charged, plaintiff's farm was flooded and his crops growing thereon were destroyed.

The action is founded on section 5222, Mo. R. S. A., which provides as follows:

"It shall be the duty of every corporation, company or person owning or operating any railroad or branch thereof in this state, and of any corporation, company or person constructing any railroad in this state, within three months after the completion of the same through any county in this state, to cause to be constructed and maintained suitable openings across and through the right of way and roadbed of such railroad, and suitable ditches and drains along each side of the roadbed of such railroad, to connect with ditches, drains or watercourses, so as to afford sufficient outlet to drain and carry off the water, including surface water, along such railroad whenever the draining of such water has been obstructed or rendered necessary by the construction of such railroad."

The trial, with a jury, resulted in a verdict in favor of plaintiff for $2000. Judgment was given accordingly, and defendant appeals.

Defendant assigns error here for the refusal of its instruction in the nature of a demurrer to the evidence.

Defendant's roadbed is on an embankment, and the right of way constitutes the western boundary of plaintiff's farm. Chambers Road, which is a public highway built on an embankment, is the southern boundary of plaintiff's farm and crosses defendant's right of way over a viaduct.

Plaintiff's farm, consisting of nineteen acres, is devoted chiefly to the growing of garden truck. It is a part of a natural drainage area containing about 240 acres. The drainage of this area empties into a natural watercourse or creek which has its source some distance northwest of plaintiff's farm and west of defendant's right of way. This creek flows in a southeastwardly direction through a culvert across defendant's right of way, thence diagonally across the farm north of plaintiff's farm, and thence southwardly across the middle of plaintiff's farm to and through a culvert under Chambers Road. There are two culverts across defendant's right of way, constructed and maintained by defendant, south of the culvert through which the creek runs and north of Chambers Road. They are designated in the record as culverts Nos. 2 and 3. The culvert through which the creek runs is designated as culvert No. 1. It is four feet in diameter and fifty feet long. The culvert under Chambers Road is designated as culvert No. 4. It is five feet high and twelve feet wide. The water discharged through culverts Nos. 2 and 3 is carried through ditches eastwardly into the creek.

The railroad embankment cuts diagonally across the watershed, obstructing the natural flow of the water from west to east. There is a drainage ditch constructed along the west side of the embankment, from which the water flows through culverts Nos. 1, 2 and 3. It appears that the culverts were originally so constructed and placed as to take care of the water that would normally flow through them. And the evidence shows that they did properly carry off all the water for many years prior to the rainfall which flooded plaintiff's farm.

The farm had never been flooded before by other rainfalls.

The evidence tends to show that there was a heavy rainfall on July 9, 1942, which was prevented from draining in a normal and natural manner because culvert No. 1, although originally of sufficient size to carry off all the water, was insufficient to do so at the time of this rainfall because the bottom of the culvert was two feet below the level of the creek bed, so that the insufficiency of the culvert to carry off the water as it fell caused a damming up of the water on the west side of the embankment to such an extent that the water rose up and flowed over the roadbed, and in this process railroad ties belonging to defendant, lying along beside the railroad tracks, were washed into the creek and were carried into culvert No. 4 under Chambers Road, causing it to dam up and impound the water on plaintiff's farm, thereby completely destroying his crops. The ties weighed about two hundred pounds each. It seemed that some of the ties floating down the creek knocked boards from two bridges, and these boards taken down stream by the current lodged at or near the culvert under Chambers Road and aided in damming it up. All previous rainfalls had been properly taken care of by the culvert under the railroad because the culvert had been kept open so that the full size of the culvert was available for the flow of the water, whereas at the time plaintiff's farm was flooded defendant had permitted the bed of the creek to build up at the ends of the culvert so that the bottom of the culvert was two feet lower than the bed of the creek as so built up, whereby the culvert was so choked that it could not properly carry off the water as it did before.

Defendant puts its assignment of error on the ground that the flooding of plaintiff's farm was the result of an act of God, that is, an unusual, extraordinary, and unexpected rainfall.

The evidence shows that the rainfall occurred between the hours of twelve midnight and six A. M.

The records of the Weather Bureau for this area show that the rainfall on that date was .53 from 12 to 1, 2.00 from 1 to 2, 1.02 from 2 to 3, .87 from 3 to 4, 1.24 from 4 to 5, and .16 from 5 to 6. During that period the average rainfall per hour was .97. The peak of intensity for a period of five minutes was at the rate of 7.2 per hour, for a period of ten minutes at the rate of 6.00 per hour; for a period of fifteen minutes at the rate of 5.2 per hour; for a period of thirty minutes at the rate of 2.95 per hour; for a period of sixty minutes at the rate of 2.07 per hour.

In 1897 there was a rainfall of an intensity of 10.56 per hour for a period of five minutes; in 1898, 8.88 per hour; again in 1898, 7.2 per hour; in 1900, 7.2 per hour; again in 1900, 7.44 per hour; in 1923, 7.05 per hour; in 1933, 6.6 per hour. In the ten-minute periods we had in 1923 an intensity of 6.24 per hour, and in 1933, 5.73 per hour. In the fifteen-minute periods we had in 1923 an intensity of 5.56 per hour; in 1933, 5.2 per hour; and in 1913, 5.00 per hour. In

the thirty-minute periods in 1923 the intensity was 5.1; in 1933, 4.45; in 1942, 2.95; in 1912, 3.7; in 1913, 3.5; in 1914, 3.06. In the sixty-minute periods on July 9, 1942, the intensity was 2.05; in 1913, 1.97; in 1923, 3.35; in 1933, 3.48.

Besides, it appears from the opinion in Ford v. Wabash Railroad Co., 318 Mo. 723, 300 S. W. 769, relied on by defendant, that on August 24, 1918, there was a rainfall of 3.6 inches in one hour.

Joe Ribello testified for plaintiff that he had lived with his father on this place for twenty-seven years; that the Burlington track was there when they moved in; that he had seen heavier rains there than the one of July 9, 1942; that ''we had a lot of rains like that before since we lived on that place;'' that ''in twenty-seven years we had about fifteen or twenty rains like that.''

Numerous definitions of the expression ''act of God'' are found in the books. The expression is not susceptible of a precise and comprehensive definition. Its meaning is best arrived at by practical illustration. The text of 4 R. C. L. 713, after reciting numerous definitions of the expression, says:

''The instances (of what occurrences have been held by the courts to come within the legal comprehension of the expression) most often mentioned in the books are, as has been seen, lightning, tornadoes, storms or tempests, earthquakes, and sudden squalls of wind. In the same category would come any unprecedented flood or sudden inundation which no human power could stay and no foresight or prudence anticipate. However, to constitute an act of Providence it seems that a storm, flood or freshet need not be unprecedented, if it is unusual, extraordinary and unexpected. Thus, it has been held that a carrier is not liable for damage caused by a flood such as occurs but twice in a generation, nor is the fact that such a flood has occurred once in each of two preceding years sufficient to make it liable.''

Our Supreme Court in Ford v. Wabash Railroad Co., supra, quoted this text, but did not say that it correctly announced the law.

In Ellet v. St. Louis, Kansas City & Northern Railway Co., 76 Mo. 518, relied on by defendant, a physician who had resided in the locality of the rainstorm for nine years, testified that the rain was the hardest he had even seen; that he was on horseback on a level prairie and that his horse was knee-deep in water in a space of ten minutes; and that spouts of water fell/as thick as his arm. In that case the court said that the statute requiring railway companies to construct ditches and drains along the sides of their roadbeds could not be interpreted to mean that a railroad company should anticipate and make provision for floods ''which are extraordinary and unprecedented in the locality where such ditches and drains are required to be constructed.''

An instruction given for the defendant in that case and approved by the court as correctly stating the law, directed a verdict for defendant if the ditch or waterway was sufficient in size to carry off

the water that fell where the accident occurred "during the greatest storm which had previously been known to have occurred in that locality."

In Flori v. City of St. Louis, 69 Mo. 341, the court, in holding an instruction erroneous, said:

"There was no obligation on the city in the construction and maintenance of the market house to anticipate unprecedented wind storms, as required by the instruction. It would be strange doctrine to require defendant to anticipate such a storm as had never before occurred, and provide against it in the erection and maintenance of a market house."

In that case there was evidence showing that the building was blown down by a storm of unusual force, amounting to a cyclone.

In Evans v. Wabash Railroad Co., 222 Mo. 435, 121 S. W. 36, relied on by defendant, it was not claimed that the accident was due to an "act of God" in the strict interpretation of that phrase, but rather that it was due to the doctrine involved in the phrase "*vis major*", which is defined to be an irresistible natural cause which cannot be guarded against by the ordinary exertions of human skill and prudence. Concerning the character of the snowstorm involved in that case the court said:

"The facts developed concerning the storm that was raging at or about the time of this accident are practically undisputed, and the evidence clearly shows that the snow and wind storm which was raging at the time of the collision was of a most extraordinary and unprecedented character in that locality. There are no contradictions upon this subject among the witnesses. Every witness who testified gave it that character. It was such a storm that could not reasonably have been anticipated by the agents, servants and employees of the appellant."

In Cooney v. Pryor (Mo. App.), 203 S. W. 630, the court said that the law is that a railroad company's duty "does not require it to ditch against an extraordinary and unprecedented downfall of water."

In Sherwood v. St. Louis-San Francisco Railway Co. (Mo. App.), 187 S. W. 260, it was held that plaintiff was not entitled to recover if "the flood in question was of such extraordinary and unprecedented magnitude that defendant in building and maintaining its roadbed was guilty of negligence in not anticipating" that the opening in its embankment would be too small to let through the water accumulating there.

In Harris v. St. Louis-San Francisco Railway Co., 224 Mo. App. 455, 27 S. W. (2d) 1072, it was held that "defendant is not required to anticipate and provide against the effects of an extraordinary and unprecedented flood."

There can be no question under the evidence in the present case that the rainfall which flooded plaintiff's farm was not unprecedented

in recent years. Whether or not defendant ought to have anticipated or expected that such a rainfall would occur was clearly an issue for the jury.

The instruction in the nature of a demurrer to the evidence was properly refused.

Witness Buchmueller, an expert who specialized in hydraulics and the study of rainfall, was permitted to testify, over the objection of defendant, to the effect that, from his study of rainfalls as shown by the records of the Weather Bureau, the rainfall of July 9, 1942, was one which might have been reasonably anticipated. This was manifest error. It was clearly an invasion of the province of the jury. The conclusion of an expert from a study of weather records as to rainfalls to be anticipated is not the criterion to be adopted by the jury. The criterion is what the average man ought to anticipate. The admission of this conclusion of the witness could hardly have failed to influence the minds of the jurors to the prejudice of the defendant.

The court also committed error in the giving of plaintiff's instruction No. 1. The instruction covered the whole case and directed a verdict. It was erroneous in submitting that defendant negligently constructed its roadbed by installing small or insufficient openings, and that defendant negligently constructed and maintained said openings. The instruction in this respect has no support in the evidence. There is no evidence of any negligence in the construction or maintenance of culverts Nos. 2 and 3, under the railroad embankment. Only the insufficiency of culvert No. 1 was shown. So far as the evidence shows the insufficiency of this culvert was solely responsible for the flooding of plaintiff's farm. The instruction in submitting the insufficiency of all three must have been confusing and misleading to the jury. It did not submit the case made by the evidence.

The instruction was further erroneous in submitting that defendant built its embankment across the creek, its branches and prongs, and that a large volume of water flowed through the creek, its branches and prongs, down to and against the embankment. There was no evidence that the embankment was built across any branches or prongs of the creek, or that the creek had any branches or prongs.

Furthermore, an instruction very similar to this one was held erroneous in King v. Lusk (Mo. App.), 196 S. W. 67, for permitting the jury to find the openings in the embankment to be insufficient without giving them any rule by which to determine their insufficiency, giving the jury a roving commission and inviting them to set up any standard whch might suit their fancy by which to judge the sufficiency or not of the openings. The present instruction is subject to the same objection.

Other questions raised will doubtless not recur on another trial.

For the errors mentioned the judgment should be reversed and the cause remanded.

PER CURIAM:—The foregoing opinion of SUTTON, C., is adopted as the opinion of the court. The judgment of the circuit court is accordingly reversed and the cause remanded. *Hughes, P. J.*, and *McCullen* and *Anderson, JJ.*, concur.