W. H. MURPHY, Respondent, v. ST. LOUIS, SAN FRANCISCO RAILROAD COMPANY and JAMES LUSK and Others, Recievers, Appellants.

Kansas City Court of Appeals, November 29, 1920.

1. **PETITION: Water: Negligence: Cause of Action Stated Under Statute: Embankment Obstructing Natural Drain: Overflow of Land: Damaging Crops of Landowner.** Under section 3150, Revised Statutes 1909, a petition which avers that a natural drain was completely closed up by embankment and the only other avenue of drainage, the channel of a river under a bridge was obstructed and reduced, so that water collected and was damned up because of said obstruction damaging crops thereby, states a cause of action.

2. **PLEADING: Cause of Action Defectively Stated Good After Verdict.** Even if the petition stated a cause of action defectively it is good after verdict, because no attack was made thereon prior thereto.

3. **WORDS AND PHRASES: "Drain," Not a Ditch or Running Stream is Within Statute.** A drain which is well defined, but is not a ditch or running stream, is within the purview of section 3150 Revised Statutes 1909.

4. **———: Ditch or Drain Defined.** A ditch or drain has no technical or exact meaning and has been defined to mean a hollow or open space in the ground, natural or artificial, where water is collected, or passed off.

5. **RAILROADS: Watercourses: Statute Requires Railroad, or Operators Thereof, to Maintain Openings for Outlet of Water Through Obstruction.** The purpose of the statute is to require railroads, or operators thereof, to maintain openings and ditches through obstruction connecting with ditches, drains or watercourses, to sufficiently let water pass off which the building of a railroad em-

bankment obstructed and prevented the drains or watercourses from carrying off.

6. ———: Obstruction of Drain: Outlet. The statute is not merely to prevent the damning up of a drain, but to compel the railroad to furnish an outlet for surface water, which, but for the railroad would reach a watercourse or drain.

7. STATUTE: Application: Overflow: Surface Water Obstructed by Embankment. Section 3150, Revised Statute 1909, has no application to overflow or surface water, but where rain fall, as well as the overflow of streams would, but for an embankment erected by a railroad, flow through the natural drain into the river, the drainage capacity of the river at the locality in question being assisted in times of flood by the drain which the embankment has shut up, the statute applies.

8. ———: Duty of Railroad Obstructing Drain by Embankment: Overflow or Surface Water. Under section 3150 a railroad is required to make openings for water which its embankments keep from going into a watercourse, and in that way drain off, even if it is overflow or surface water.

9. ———: Landowner Entitled to Recover Though Land Does Not Adjoin or Abutt on Railroad. The fact that plaintiff's land does not adjoin or abutt upon the railroad cannot prevent or defeat his recovery.

10. ———: Interpretation. Where a statute is penal as to one feature of it and remedial as to another feature, it should be given a liberal and fair interpretation as to the remedial feature.

11. INSTRUCTIONS: Covering Matters Not an Issue—Harmless Error. Where the evidence showed that floods were not unusual, or extraordinary, plaintiff's instructions were not fatally erroneous in not excluding unusual, unprecedented and extraordinary floods, because such issue was not in the case.

ON MOTION FOR REHEARING.

12. INSTRUCTIONS: Unnecessary to Submit Conceded Matters. In an action where an obstruction to a drain and an obstruction to a river jointly cause the damage done, an instruction which mentioned only the obstruction to the drain thereby omitting the obstruction to the river, it was unnecessary to submit that matter to the jury where the evidence on both sides shows that the damage done by the obstruction in the river was conceded.

13. EVIDENCE: Prior Overflows: Admissible as Evidence of Obstruction of Drain. Evidence of overflows in previous years at which times

waters were held back and rose so high at the point where the embankment crossed the drain that the water was higher than the embankment and broke over, washing out portions of the embankment, whereupon the waters went rapidly away, constitutes evidence of the obstruction of the drain by the embankment.

14. **INSTRUCTIONS: Failure to Instruct Upon an Issue Not in the Case is Not Error.** Where it was admitted that the channel of the river was obstructed and that there were no openings, the question of the suitability of openings was not an issue in the case and there was no error in failing to tell the jury what constituted a suitable opening.

Appeal from Henry County Circuit Court.—*Hon. C. A. Calvird,* Judge.

AFFIRMED.

*James D. Lindsay* and *Payton A. Parks* for respondent.

*William F. Evans, E. T. Miller, John H. Lucas, William C. Lucas* and *John A. Gilbreath* for appellants.

TRIMBLE, J.—This action, instituted on March 31, 1916, was brought by a landowner against the St. Louis and San Francisco Railroad Company and its Receivers, for damages to crops from overflow of water obstructed until it backed over and was held on plaintiff's land by defendants' roadbed and line of railway. The cause of action relied upon is that given by section 3150, Revised Statutes 1909. The petition originally was in three counts, the first alleging damage to crops from an overflow in October, 1914, the second, a similar injury from an overflow in May, 1915, and the third stating another loss on account of an overflow in September, 1915. Upon the trial the suit was dismissed as to the company itself, the cause proceeding against the Receivers who were shown to have been in charge of and operating the railway, having been put in charge thereof, in April, 1913, and who have been in charge thereof ever since. At the close of the case, a demurrer was

offered by the defendant Receivers to the evidence under each count. The court indicated that it would sustain the demurrer to the second count because the evidence conclusively showed the overflow of May, 1915, was from a flood or rainfall of unusual and unprecedented character, whereupon plaintiff dismissed the second count, leaving the case standing upon the first and third counts wherein plaintiff asked judgment for $562.50 and $525 respectively. The court overruled the demurrers to these counts and submitted the case to the jury. A verdict for plaintiff was returned for $281.25 on the first count and $262.50 on the second. The Receivers have appealed.

Grand River, in Henry County, at the locality involved herein, flows almost south but somewhat in a southeasterly direction and is crossed by the railroad on its bridge. From this bridge the river flows in a more southerly direction. The railroad, at said locality, runs from the northeast to the southwest, that is, as the railroad on the north or east side of the river approaches said stream it does so from a northeasterly direction, and from the crossing point, runs southwesterly and then southerly until, at a distance of about a half mile south of the bridge, it reaches high ground, much higher than the banks of the river and wholly out of reach of any overflow of water therefrom.

Deepwater Creek runs in an easterly direction toward Grand River and empties into the latter at a point about 300 feet above the railroad bridge. Plaintiff's farm of 110 acres lies south of Deepwater Creek, and Cooper Creek, running north into Deepwater, forms the eastern boundary of said farm. As thus located, plaintiff's land is about a mile west of the nearest point of the railway track as it runs from the bridge in a southwesterly direction and curves to the south on its way to the high land above mentioned.

In addition to the drainage into Grand River afforded through Cooper and Deepwater Creeks, flowing as above indicated, there is a natural drain across the terri-

tory lying south of Deepwater and between plaintiff's land and Grand River. This natural drain began not far east of Cooper Creek and, prior to the construction of the embankment, ran eastwardly into Grand River at a point about a quarter of a mile south of where the railroad bridge is now located. This natural drain consisted partly of a "chain of lakes," (to use an expression of the witnesses) and a depression connecting them and continuing on to the river. The railroad, from the bridge southwest and south over the above mentioned territory lying between plaintiff's land and Grand River, was constructed on a solid embankment fifteen feet high having no openings therein and running from the south end of the bridge to the high ground above mentioned. Said embankment crosses said natural drain about a quarter of a mile south of the bridge. At the point where the embankment crosses said drain, the latter is six feet deep and about 200 feet wide and the embankment forms a solid dam across it. The bottom of the drain at this point is about fifteen feet lower than the ground at the south end of the bridge. The ditch running along the west, or northwest and upper, side of the railroad embankment from the drain toward Grand River, is grown up with small trees, etc.

The bridge across Grand River is about 250 feet in length and is 25 feet above the river, but plaintiff's evidence shows that two of the piers are out in the course of the river's channel and carrying capacity, and they obstruct the water as it flows under the bridge. There was no evidence to contradict this. When Grand River got high, the water which did not pass out under the bridge flowed out along the embankment in the so called ditch alongside it into the drain and was there held by the embankment along with all other water, surface or otherwise, that came through the drain across the territory hereinabove mentioned. And when water was thus impeded at the bridge, it increased the water in the channel above so that Deepwater and Cooper Creeks also overflowed into the drain until this backed up and stood

on plaintiff's land. Finally after sufficient time had elapsed for the water to pass out through the decreased opening under the bridge in Grand River, the waters thus held back by the bridge and the embankment would escape in that way. But, being so held back, they encroached and stood upon plaintiff's land, and remained there so long that his matured crops were injured and destroyed.

The evidence in plaintiff's behalf is that prior to the erection of the railroad embankment the water flowing in this drain across the territory above mentioned continued on until it emptied into Grand River about a quarter of a mile below the bridge site. Grand River has a large water shed and many tributaries above the bridge, and an immense volume of water comes down it to be carried off even in ordinary times; and the reducing of the channel under the bridge and the closing of the drain (which operated as an assistant outlet in carrying the water further down the river), caused the water to back up to and be held upon plaintiff's land until it eventually escaped under the bridge as hereinbefore stated, and in the meantime his crops were ruined. Prior to the years in question, overflows occurred, and the water held back rose so high that, at the place where the embankment crossed the drain, the water got higher than the embankment and broke it, and on one of such occasions 800 feet of the embankment washed out whereupon the waters went away rapidly. The embankment was replaced and it and the track were strengthened by cables fastened to trees, etc., so that, presumably, for that reason the extraordinarily high flood of May, 1915, did not wash it out. The waters, dammed up in the overflows of October, 1914, and September, 1915, for which the suit was brought, did not break over the embankment, but they rose to a sufficient height to back up and cover plaintiff's land to such a depth and for such a length of time that his crops were destroyed.

A reading of plaintiff's petition will disclose that it does not confine itself to charge that, defendants

negligently maintained merely the embankment across
the natural drain and failed to keep openings in it and to
keep open lateral ditches along it to carry off said water.
The petition sets out the situation and surroundings at
the locality in question and then charges that the embank-
ment, solid in character and without openings, *completely
obstructed* the waters, surface or otherwise, flowing in
said drain and all of them were forced to flow in the
channel under said bridge, and that "said *bridge* is so
constructed and maintained that *its piers and abutments
extend into the natural channel of said river and obstruct
the natural flow of waters therein*" etc., and that by rea-
son of the obstruction of the natural drain and "the ob-
struction of the channel of said Grand River by the piers
and supports of said bridge" and the maintenance of
the embankments on both sides of the river, the waters,
surface or otherwise, were dammed up and obstructed.
It then charges that it was the duty of defendants to con-
struct and maintain "suitable openings" through and
across the right of way and roadbed of said railroad and
suitable lateral ditches to connect with said natural drain
and with Grand River so as to afford sufficient outlet to
carry off the waters, including surface water, at and
along "the place *and places above described;*" and that
the said water was and is obstructed, and its drainage is
rendered necessary, "by the construction and mainten-
ance of said *railroad* in thei manner described." The
petition then charged that because of the construction and
maintenance of the roadbed and embankments and be-
cause of the failure to maintain suitable openings and to
keep open lateral ditches as hereinbefore described, so as
to afford sufficient outlet to drain and carry off overflow
water, surface water and rainfall, the same collected and
was dammed up *"because of said obstructions"* and
plaintiff's crop was damaged. So that it is manifest the
petition is not limited to the mere damming up of the
natural drain with the embankment but includes also the
obstructing of the channel of Grand River under said
bridge. It is charged that the petition states no cause of

action. This contention rests upon the theory that the case is grounded solely upon the obstructing of the natural drain and that the latter is not such a drain as is contemplated in section 3150. So far as plaintiff's pleading is concerned, as we have heretofore shown, two obstructions, that of the channel under the bridge and that of the natural drain, are alleged; and in view of the fact that the outlet afforded by the natural drain is alleged to have been *completely closed up* and the only other avenue of drainage, the channel of the river under the bridge, was *obstructed and reduced,* we are wholly unable to perceive wherein it can be said that the petition fails to state a cause of action. We think that unquestionably it does; but even if it stated one defectively, it is now good after verdict because no attack was made thereon prior thereto. [Applegate v. Quincy, Omaha, etc., R. Co., 252 Mo. 173.]

The claim that the drain is not within the purview of the statute seems to rest upon more than the mere fact that it is not a watercourse in the sense of a running stream with well defined banks. It is well defined but is not a ditch or a running stream. It does not have to be such to come within the statute. [Pace v. St. Louis, etc. R. Co., 174 Mo. App. 227, 232.] The statute requires the owners or operators (in this case the receivers) of any railroad to construct and maintain suitable openings through and across its right of way to connect with "ditches, *drains* or watercourses" so as to afford sufficient outlet to drain off the water, including surface water, "whenever the draining of such water has been obstructed or *rendered necessary* by the construction of such railroad." So that, in view of the object to be accomplished by the statute and the plain wording thereof, we cannot say that the drain herein is not such as is contemplated by the statute. A ditch or drain has no technical or exact meaning, and has been defined to mean a "hollow or open space in the ground, natural or artificial, where water is collected or passes off." [18 Corp. Juris, 1404.] The purpose of the statute is to require

railroads to maintain openings and ditches connecting with ditches, drains or watercourses which would carry off the water which the building of the railroad *would obstruct and prevent the drains or watercourses from carrying off*. So that no matter what the physical characteristics of the drain be, whether that of a channel with steep precipitous banks or a running stream, or a depression with sloping banks such as a slough or swale or chain of lakes, if it performed the functions of a drain or an outlet for the water, and the building of the railroad obstructed it, the statute requires the railroad or the operator thereof to maintain openings and connecting ditches so as to let the water pass off.

Indeed, if an embankment collects and holds surface water and *prevents it from getting into* a watercourse ditch or drain so as to pass off, then it is the duty of the railroad under the statute to afford an outlet to such water, even though the embankment does not actually cross or dam up a drain. For, the purpose of the statute is not merely to prevent the damming up of a drain, but to compel the railroad to furnish an outlet for surface water which, *but for the railroad,* would reach a watercourse or drain. But defendants' contention goes deeper than the mere objection to the physical characteristics of a drain. Although the embankment obstructs the flow of water from rainfall on the territory drained by the aforesaid natural drain, yet the water which caused the damage to plaintiff's crops was caused by *overflows* from the two creeks above named and from the river. In the case of Goll v. Chicago, etc., R. Co., 271 Mo. 655, the Supreme Court holds that the statute does not apply to a situation where waters have overflowed a stream, *through no fault of the railroad,* and are then held by a railroad embankment, that such overflow constitutes surface water, and that, in the situation *presented in that case,* such overflow or surface water is governed by the common-law rule which permitted every one to fend against it as a common enemy without liability for so doing; and that while the Legislature might forbid a rail-

road obstructing the overflow of streams and require it to take care thereof afterwards, it has not, as yet, done so. Although plaintiff in the case at bar *pleaded* an obstruction of the channel of the *river* as well as an obstruction of the *drain*, yet in the instructions submitting his case to the jury he based it solely on the obstruction of the latter without including or saying anything about the reduction of the river channel under the bridge or the failure of the lateral ditch to afford sufficient outlet. Hence it becomes necessary to pass upon the question whether a case can be made for plaintiff under the statute based wholly upon the obstruction of the drain and without regard to whether the railroad obstructed the river.

It will be observed that in the Goll case, as well as in the case of Vanlandingham v. Quincy, etc., R. Co., 206 S. W. 399, the property damaged was on *one* side of the river while the railroad embankment charged to have obstructed the water was on the *other* side; and in the case of Adair Drainage District v. Quincy, etc., R. Co., 217 S. W. 70, the evidence showed that the Chariton river was *not obstructed,* that the ditch, also charged to have been obstructed, emptied into the river on the *east* side thereof and *east* of where the embankment complained of was located, which embankment was on the west or *opposite* side of the river from that of plaintiff's ditch. In other words, the embankment in those cases did not cast the water on the property claimed to be damaged; the overflow of the streams did that, and the statute was construed as not requiring the railroad to refrain from obstructing an overflow after it had, without fault of the railway, escaped from the bed of its stream and became surface water. In those cases, as stated in the Adair Drainage District opinion at p. 72 of the opinion, the effect of the embankments was "to cause the water to flow *towards* the channel of the river and to keep it from flowing *away from it.*" The effect of the embankment in the case at bar, however, was exactly the opposite of this. The rainfall, as well as the overflow of the streams, would,

but for the embankment, flow through the natural drain into the river at a point further down. In other words, here is a case where the drainage capacity of the river at the locality in question is assisted in times of flood by another drain and this drain the embankment has shut up. Must the statute be construed as not applying merely because the water obstructed by the embankment is overflow or surface water? It is difficult to see how the above cases can be meant to hold unqualifiedly that section 3150 has no application to overflow or surface water. For, the purpose of the statute, as *expressly* stated therein since the Amendment of 1907, is to require "suitable openings across and through the right of way and road-bed of such railroad . . . to connect with ditches, drains or watercourses, so as to afford sufficient outlet to drain and carry off the water, *including surface water,* whenever the draining of such water *has been obstructed* or *rendered necessary* by the construction of such railroad." Prior to 1907, the statute did not require openings to be made in the embankment nor was surface water mentioned therein. Hence there was no duty to have *openings* therefor since the statute required only lateral ditches and, as to openings, the common-law rule as to surface water was in force. [Abbott v. Kansas City & St. Jos. R. Co., 83 Mo. 271.] In 1903 the Supreme Court, in Cox v. Hannibal & St. Joseph R. Co., 174 Mo. 588, 606, which was a suit for failure to maintain lateral ditches, held that the statute was "an innovation upon the common law as it clearly has reference to *overflow water,* which is surface water, as well as water from rain falls and melting snow; otherwise *it is meaningless.*" (Italics ours.) Just before stating this, Judge BURGESS discussed the contention that *overflow* water must have caused the damage and said it was true the creek overflowed the land before the railroad was built but that the water did not *stand* on the land, but that *after* the water got out of the creek the embankment *held* it on plaintiff's land, and said "But where it came from is immaterial for whether overflow or surface water it was defendants'

duty to have provided a ditch'' etc., so that it could have passed out. In 1907 the Legislature amended the act by requiring the railroad to make ''suitable openings across and through the right of way and roadbed'' and inserted the words ''including surface water'' along with the water that was required to be carried off. In Tranbarger v. Chicago, etc., R. Co., 250 Mo. 46, the Act as amended was under consideration, and in that case it was the ''habit of said river to overflow'' in times of high water but defendants' embankment backed and held it on plaintiff's land although there was a natural drain that would have allowed it to go off had it not been for the embankment. The Act was attacked as being unconstitutional because neither when the railroad was built in 1873, nor at the time the amendment of 1907 was enacted, did the law require any landowner to let surface water through his property. But notwithstanding this contention the Act was upheld, and it was ruled that even though the Missouri river overflowed its banks so much so as to amount in some places to a flood, yet if defendants' failure to construct outlets through its roadbed *concurred* in producing the injury, the defendant was liable. The case was taken to the U. S. Supreme Court, 238 U. S. 67. The common-law rule as to surface water in Missouri was again invoked in favor of the railroad as in the case of any other landowner.

The court however refused to sustain the point saying at pp. 75-76:

''But the right to maintain a railroad embankment or other artificial structure in such a manner as to deflect surface water from its usual course, and thereby injure the land of another, has little reference to the substantial enjoyment of the railroad right of way. Nor is it at all essential to the protection of the railroad itself from surface water. It cannot reasonably be contended that a railroad cannot be maintained and operated as safely and as conveniently over bridge, trestle, culvert, or other opening calculated to admit the passage of surface water, as upon a solid embank-

ment, or that there is any substantial advantage in favor of the latter except that it avoids the expenditure necessary to be made for the construction and maintenance of openings in order that the embankment shall no longer be the occasion of injury to the lands of others.''

At page 77 the court say—

''The present regulation is for the prevention of damage attributable to the railroad embankment itself, and amounts merely to an application of the maxim *sic utere tuo ut alienum non laedas*. Of course, compliance with it involves the expenditure of money; but so does compliance with regulations requiring a railroad company to keep its roadbed and right to way free from combustible matters; to provide its locomotive engines with spark arresters; to fence its tracks; to provide cattle guards and gates at crossings, or bridges or viaducts, or the like.''

and at page 78 say—

''Railroad embankments, stretching unbroken across tracts of land that are liable to injury from surface waters, differ so materially from other artificial constructions and improvements to which the doctrine of the ''common enemy'' applies, that there is very plainly a substantial ground for classification with respect to the object of the legislation.''

So that it would seem the statute clearly does require the railroad to make openings for water which its embankment *keeps from going into a watercourse* and in that way draining off, even if it is overflow or surface water. The cases of Goll v. Chicago, etc., R. Co., and Adair Drainage District v. Quincy, etc., R. Co., supra, do not purport to overrule or disturb the Cox or Tranbarger cases, nor is it to be conceived that they judicially repeal a plain provision of the statute. On the contrary, the reason of the holding in the Goll and similar cases is because, under the facts in those cases, *there was no watercourse into which the obstructed water would have drained* had openings been made.

Hence the embankments in those cases *were not preventing the water from getting into* the Missouri river or into a ditch, drain or watercourse with which the statute says the railroad must maintain connections.

. . .

The fact that plaintiff's land does not adjoin or abut upon the railroad, cannot prevent or defeat his recovery. The statute in giving an *action for damages,* does not limit it to adjoining landowners, though the right to construct the ditches, etc., and sue the railroad for the expense thereof if the latter does not build them, is confined to adjoining landowners. But, as to *damages* caused by a failure to obey the statute, it says the railroad company, or person operating the same, shall be liable for "all damages done by said neglect of duty." The principle necessarily deducible from the language in Cox v. Hannibal and St. Joseph R. Co., supra, and from the holdings in Skinner v. St. Louis Iron Mountain, etc., R. Co., 254 Mo. 228, 231, and Greer v. St. Louis Iron Mountain, etc., R. Co., 173 Mo. App. 276, is that plaintiff can maintain an action on the statute if his damage is caused by the defendants' failure to obey the commands therein imposed. While the statute is penal as to one feature of it, yet it is remedial as to the feature under consideration herein. [34 Cyc. 1201.] Hence it should be given a liberal and fair interpretation in this regard at least. [Shohoney v. Kansas City R. Co., 231 Mo. 131.]

Plaintiff's evidence tends to show that the floods of October, 1914, and September, 1915, covered by the two counts, were not unusual or extraordinary, and hence we are wholly without warrant in holding that the demurrers to the evidence should have been sutained on the theory the floods were conclusively shown to be extraordinary or unprecedented.

The defendants did not plead that the floods were unusual or extraordinary. There was no evidence that those causing the damage sued for in the first and third counts were unprecedented but, on the other hand, the

evidence is that they were not. So that, as such issue was not in the case, the plaintiff's instructions were not fatally erroneous in not excluding unusual, unprecedented or extraordinary floods. . . .

The judgment is reversed and the cause remanded for a new trial. All concur.

## On Rehearing.

BLAND, J.—In addition to what was said by TRIMBLE, J., upon the original submission of the case we make the following observations.

· The case of Adair Drainage District v. Q. O. & K. C. Railroad, 217 S. W. 70, which has been called to our attention by defendants since the opinion by TRIMBLE, J., is not in conflict with anything said in the original opinion. The facts in that case show the case is practically on all fours with the Goll case. The Goll case has been exhaustively discussed in the original opinion herein and the facts in that case differentiated from those in the case at bar. So it is not necessary to go into the discussion of the Adair Drainage District case, for the reason that it is quite apparent that the facts in that case and those in the case at bar are not at all similar. Neither can the facts in this case bring it within the cases of Vanlandingham v. Railroad, 206 S. W. 399; Johnson v. Leazenby, 216 S. W. 49, and Carson v. Schaff, 221 S. W. 825.

We have again carefully examined the record and we find that plaintiff's instruction No. 1 covering the entire case and directing a verdict mentions only the obstruction to the drain without including or saying anything about the obstruction to the river channel under the bridge. We believe that it would be impossible to separate the damage done by the obstruction in the river channel from that done by the embankment. However, we now find that there was evidence on both sides that the bridge was obstructed. Defendants have filed here photographs showing large piers in the bed of the

river which necessarily must have obstructed the channel of the river to some extent. Defendants' witness Busch, their assistant engineer, testified that there were two piers in the river channel ten feet square at the bottom and four feet square at the top. The obstruction of the river being conceded, it was unnecessary to submit that matter to the jury.

We also think there is no question but there was evidence tending to show that the embankment obstructed the drain for the reason that there were overflows in previous years and at those times the waters were held back and rose so high at the point where the embankment crossed the drain that the water was higher than the embankment and broke over and on one occasion washed out several hundred feet of the embankment, whereupon the waters went away rapidly. The embankment was replaced and so strengthened and braced that it became indestructible from the ravages of such waters. This constituted evidence of obstruction of the drain by the embankment. [Grace v. M. K. & T. Ry. Co., 212 S. W. 41, 42.]

There was no error in the court failing to tell the jury what constituted a "suitable" opening. It was held in King v. Lusk, et al., 196 S. W. 67, 69, that "suitable openings" means "openings of sufficient size to carry such a volume of water as could reasonably be expected to pass through them." There was no evidence in the case at bar of any extraordinary or unprecedented rainfall and that was not an issue in the case. In the case of King v. Lusk, supra, there was evidence of unprecedented rainfall and that there were openings present but they were claimed to have been inadequate. Here it was admitted that the channel of the river was obstructed and that there were no openings. So it is apparent that the question of the suitability of openings was not an issue in the case. Defendants recognized this in instruction No. 1 where they refer to "additional" openings.

We find that there was no error in the trial of the case and the judgment will therefore be affirmed. All concur.