W. A. HARRIS, RESPONDENT, v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, APPELLANT.

Springfield Court of Appeals. May 20, 1930.

*E. T. Miller* and *Ward & Reeves* for appellant.

*Orville Zimmerman* for respondent.

BAILEY, J.—This is an action for damages for loss of crops alleged to have been caused by defendant's negligence in failing to maintain suitable openings through its roadbed and embankment, thereby causing rain and surface water to stand on plaintiff's land. Upon trial to a jury plaintiff obtained a favorable verdict and defendant has appealed from the judgment.

The petition sets forth the fact that part of plaintiff's land lies west of defendant's line of railroad running from Campbell to Holcomb, Missouri. The petition further contains the following allegation, "that during the crop year 1926 he cultivated six acres of said land in cotton and twenty acres in corn, and that said land yielded 1000 pounds of cotton per acre and forty bushels of corn per acre; that because of the failure of defendant to maintain suitable openings through its roadbed and right of way to connect with natural drains on the east of defendant's road, rain and surface water in January, 1927, was caused to back up and stand upon the land cultivated by plaintiff and to destroy said six acres of cotton and said twenty acres of corn, all yet ungathered." There is a further similar allegation as to crops planted in 1927.

No question is raised as to the pleadings in this case and we take it to be conceded that this petition is founded upon the provisions of section 9953, Revised Statutes 1919, relating to ditches and drains. That statute, in so far as material here, reads as follows: "It shall be the duty of every corporation, company or person owning or operating any railroad or branch thereof in this State, and of any corporation, company or person constructing any railroad in this State, within three months after the completion of the same through any county in this State, to cause to be constructed and maintained suitable openings across and through the right of way and roadbed of such railroad, and suitable ditches and drains along each side of the roadbed of such railroad, to connect with ditches, drains or watercourses, so as to afford sufficient outlet to drain and carry off the water, including surface water, along such railroad whenever the draining of such water has been obstructed or rendered necessary by the construction of such railroad."

Defendant's main contention, as shown by its assignment of errors, brief and argument, is that its demurrer to the evidence should have been sustained. This involves a consideration of the evidence which may be briefly stated without a consideration of the testimony of each particular witness. The evidence most favorable to plaintiff shows that plaintiff's land is split by defendant's line of railroad in Dunklin county. The railroad runs north and south and was built some thirty years ago and at that time most of the lands be-

tween Kennett, Missouri, and Campbell, including plaintiff's lands, were swamps and overflow lands. Defendant's railroad was built on slightly elevated ground separating the basins of the St. Francis River and Little River. In about the year 1912, there was constructed a small levee along the east side of the St. Francis River and since that time this levee has been maintained by the St. Francis River Levee District. The evidence also shows that drainage districts were formed at the time of the formation of the levee district and numerous ditches were constructed in the territory east of the St. Francis Levee and east of defendant's railroad tracks and across the river in Dunklin and Pemiscot counties. The evidence also shows that the St. Francis River Levee was constructed to a height of eight or eight and one-half feet but had a crown three feet in width and a forty-foot base, designed to confine the waters to the St. Francis River and keep from flooding the country. The drainage districts constructed east of the St. Francis River were also intended to drain the land and take care of the local rain waters. It also appears that plaintiff's land is located about three miles south of Gibson and about six and one-half miles east of the St. Francis River Levee. Defendant's railroad comes out at Gibson running southeast and runs through plaintiff's eighty acres of land. About sixty-five acres of the farm lies west of the railroad embankment. There are watercourses running through plaintiff's land known as Sand Slough, at the south corner, and Mud Slough which runs around the farm and around the ridge between the farm and Gibson and empties into Taylor Slough at a point east of Gibson.

Prior to the time the levees heretofore mentioned were built on the St. Francis River, these sloughs were more or less filled with water at all times and defendant maintained trestles or openings across these sloughs. Since the building of the levees, these sloughs exist as dry sloughs, although Taylor Slough, part of the way at least, has been supplanted by ditch number two, constructed by the Little River Drainage District. These various sloughs, it seems to be conceded, were natural drains for plaintiff's land and other adjoining lands. After the construction of the levee on the St. Francis River, as aforesaid, it seems that defendant undertook to close up the opening on the railroad embankment where the sloughs were and by the year 1926, had closed and filled in all the sloughs heretofore mentioned except a little opening in what is known as Sand Slough and about one-third of the trestle at the opening of Mud Slough.

Plaintiff testified that the closing of the last two openings in 1926, caused his trouble because the water could not get by; that the levee broke in 1927, and when it broke the water just kept rising and it flowed over the top of the railroad and finally washed out the railroad; that on the west dump the water was eighteen to twenty-seven

inches higher than on the east side; that he was able to gather crops on the east side of the railroad because he gathered it first and before the water got over it, but was unable to gather corn on the west side of defendant's embankment, and after the flood there was not any crops to gather. Plaintiff further testified that just above his field the railroad dump is six and one-half feet high and just below five feet and seven inches high; that his field is on a ridge and the water got so high it ran over defendant's railroad track; that if the opening had been left and the railroad bed, the waters would have gone through because it had gone through prior to 1927 when breaks occurred on the St. Francis River in 1923. The evidence also shows that there was an unusual flood in January, 1927, and it seems to be conceded that it was of such magnitude as to be unprecedented.

The evidence on the part of plaintiff tends to show that all the lands on both sides of the railroad tracks of defendant's were overflowed at the time plaintiff's first crops were destroyed, but plaintiff's position is that, conceding the flood was due to an unprecedented rainfall, yet but for the failure of defendant to maintain the openings, which had originally been in its railroad embankment, the waters would have been let through and not kept standing on the west side of the track and over plaintiff's land and crops and he could have gathered his crops before other rises came as he did on land on the east side of the track.

The flood in January, 1927, which broke the levee on the St. Francis River was of such magnitude that several of plaintiff's witnesses testified it was the highest water ever seen by them in southeast Missouri. It also seems that the sloughs mentioned as having drained plaintiff's land prior to the building of the St. Francis River levee, still had well defined banks at the time of the floods in January, 1927, and also in December, 1927, when the second set of crops were destroyed on plaintiff's lands. The evidence also shows that the levee broke on the St. Francis River in the year 1923, flooding plaintiff's lands, but, according to plaintiff's evidence, it didn't ruin his crops because the sloughs were open and the water ran off. The flood waters, however, were not so high in 1923, as in 1927. In comparing the water of 1927, with that of 1923, plaintiff testified as follows: ''I observed the conditions here immediately west of Kennett, and northwest of Kennett, in 1923 as compared with 1927, and they had the most water in 1927. I don't know how much deeper it got in these two valleys, but I know there was more water in 1927, more east as well as west of the railroad track, I believe. I think the 1927 water was the highest I had ever seen in the St. Francis River before that at any time. I don't know how much higher the water got in the St. Francis in 1927, than I had ever seen it before, because I wasn't on the river; it got several feet higher,

might have been two or three feet higher in 1927 than in 1923 in the river; that is my best judgment. It is also my best judgment that the 1927 water in the river itself got some feet higher than I had ever seen it before in my life. When the water got out in 1927, that caused it to sweep across towards my place, that was the natural place for it to come; the general slope is east and southeast from the river. There is a kind of ridge running north, generally speaking, but with interruptions in it, but there is a general ridge separating the Little River swamp from the St. Francis River swamp; it was that way when I first knew the country; and generally speaking, this ridge runs in the neighborhood of my place and runs north from Kennett here—the high ground, I mean; a kind of dividing spot running north to Holcomb. In time of the high water in 1927, at first the flow was impeded by the railroad embankment, but later it ran clear over the top of the railroad and ran over and through for about twelve days; it must have run over the top of the railroad there in my neighborhood for two or three days, and the crops to my east were destroyed the same as towards the west of the railroad; and the reason my crop east of the railroad wasn't destroyed, I gathered it first, got part of it out before the high water in January, 1927. I got a little of it; maybe two loads after the water went down.

"Q. That was on high ground? A. No, sir. There is a gradual slope there and I got that but I couldn't get any more. Every fellow in the slough lost his crop that didn't have it out. Every man who had his crop on that land, unless on a ridge, got drowned out. Mr. Asberry has quite a bit of high land, and mine too; it is three or four or five feet higher. It didn't get over on both sides of the railroad track, but it got over the top of the railroad, for two or three days; after it came up again in 1927 it got over the railroad track again. The water got up over the railroad track in 1927 about four or five times."

The principles of law involved in this case are well established and practically agreed upon by learned counsel. Our courts have held many times that under the drainage statute here in question a railroad company may not be held liable for an unprecedented or overwhelming flood such as the evidence in this case indicates occurred in January, 1927, although the railroad company may have been negligent and violated its statutory duty in regard to constructing and maintaining suitable openings in its roadbed. In Sherwood v. Ry. Co., 187 S. W. 260, this court stated that,

"The defendant practically conceded, and the physical facts clearly show, that the opening was not 'large enough to permit the waters on plaintiff's land to pass,' and only claimed that no such volume of water had ever tried to pass before and that it had no

reasonable cause to anticipate and provide against such an extraordinary flood; that the volume of water was so great and swift that the damage would have resulted regardless of the size of the opening. The instruction is almost, in its effect, a peremptory one to find for plaintiff.

"We do not understand plaintiff to controvert the proposition that defendant is not required to anticipate and provide against the effects of an extraordinary and unprecedented flood. Unless the defendant had reasonable cause to believe that a large opening through its roadbed would be required to let through the water that was likely to accumulate there, then there is no negligence in the case." . . . "On a full consideration of this case with my Associates, we have concluded and concur in holding that the flood in question was so overwhelming in character and destructive in its results that there is no substantial evidence showing that the injury to plaintiff's farm resulted as an efficient cause from the narrowness of the opening through defendant's embankment—that it would not have occurred regardless of the size of the opening, or that defendant had any reasonable cause to anticipate and guard against, if it could have done so, such an extraordinary and unusual flood."

The same rule was announced in James v. Railroad, 69 Mo. App. 431, where the court, after quoting from substantial authority uses this language: "In the case at bar it is only by the merest conjecture that the alleged concurring negligence of the defendant can be made one of the efficient causes of the overflow of the plaintiff's land. The entire testimony tends to prove that the rainfall was so great that the result would have been the same had there been no railroad or railroad bridge. One of the witnesses gave it as his opinion that the railroad dump across the lowlands offered such resistance to the water as to increase the overflow over plaintiff's farm. This statement was, under the circumstances a mere guess. But it had no bearing, for the question was whether in ordinary high water the space left for the escape of water was reasonably sufficient."

The rule in relation to liability where an act of God and negligence on the part of defendant concur, is thus stated: "So the rule may be stated to be this: The act of God must be the sole cause of the loss or injury; and whenever the negligence of the carrier mingles with the act of God as a co-operative cause, he is liable; provided, the resulting loss is within the probable consequences of the negligent act; otherwise, it will be too remote and disconnected to be considered the proximate cause. As is said in St. Louis v. Ins. Co., 139 U. S. 237, it would be considered, 'simply as one of a series of antecedent events without which the loss could not have happened.' If, as said in Wolf v. Express Co., 43 Mo. 421, the act of God might have

been avoided by foresight or diligence (with reference, of course, to such act), then there is liability; it follows that, if there was no notice or expectation of such visitation of God, there is no liability, for, in such case, there is no concurrent negligence at time and place. The immediate injury and result in this case was occasioned by the sudden, great and unprecedented flood of 1903. It was a result almost altogether out of the course of nature. Its like had probably not occurred in the memory of anyone living. Loss from such a cause was wholly unlooked for and was not to be expected, or even taken into consideration by the most cautious.''

It is our opinion the foregoing cases are applicable to the facts in this case because plaintiff's brief concedes and the testimony reveals beyond question that the floods on the St. Francis River and for the matter throughout the whole Mississippi River basin, were unprecedented during the year 1927. That the situation as to St. Francis River in so far as danger from flood is concerned, was affected greatly by the numerous drainage districts so built as to drain into it, there can be no question and if that stood alone defendant might have been bound to have anticipated the likelihood of overflow. But when this avalanche of water from continuous rains flooded the whole country in the vicinity of plaintiff's farm, it is unreasonable to hold that any act of defendant in providing openings in its embankment could have prevented the injury to plaintiff's crops. The cases of Coggins v. Railroad, 256 S. W. 824, and Murphy v. Railroad, 205 Mo. App. 682, we do not consider in point, because no unusual floods were involved in either case. The evidence in this case indicates that the water attained such height that it flowed over the top of the six-foot railroad embankment maintained by defendant, both during January, 1927, and in December, 1927, when plaintiff's second crop was destroyed. The water was over defendant's tracks for several days and it is evident that no matter how many openings may have been maintained by defendant, the water would have stood on plaintiff's lands and covered his corn crops during that period. It would thus have destroyed the crops in any event. The fact that he gathered his corn on the east side of defendant's tracks before the flood came is no proof even that that crop would not have been destroyed had plaintiff waited later to gather it. We are firmly convinced that regardless of defendant's negligence the tremendous floods of 1927, would have destroyed plaintiff's crops.

One other of plaintiff's witnesses testified he knew of but one man who gathered corn on the east side of defendant's track after the first rise and before the second rise came and his farm was three-fourths of a mile east of the railroad. The evidence shows the rise in December, 1927, was almost as high as in January and that although

much of the roadbed or embankment had been washed from under defendant's tracks, the new crop was nevertheless destroyed.

The other phase of this case raises the question of whether or not defendant had a right to rely on the levee holding and was therefore justified in filling in its roadbed where the trestles had formerly been. We think it unnecessary to decide that question at this time. Defendant's duty was to maintain suitable openings sufficient to take care of surface water, when such openings would connect with ditches which would carry off the water. Surface water not only means rainfall, but water overflowing the banks of rivers and spreading over the surrounding country. [Schneider v. Missouri Pac. Ry. Co., 29 Mo. App. 68.] It has been held that no duty rests on the railroad company, under the statute, to construct or maintain drains unless there is a ditch, drain or watercourse with which such opening can be connected. [Grimes v. R. R. Co., 184 Mo. App. 117, 168 S. W. 317.] But such ditch or drain may be a dry one most of the year, and yet if it be a drain with sufficient outlet to carry off the surface the duty to comply with the statute is mandatory. [Murphy v. R. R., 205 Mo. App. 682, 226 S. W. 637; Coggins v. R. R. Co., supra.]

The fact that a levee was constructed on the St. Francis River would not in our opinion justify the defendant in filling in its roadbed at points where it had formerly maintained openings over natural drains if by so doing it obstructed such drains to the extent that the surface water, including the ordinarily to be anticipated overflow from the river, would not be permitted to pass off through such drains. The evidence in this case indicates that surface water did pass off through Taylor Slough and what is termed Drainage Ditch No. 2, which in a measure had supplanted Taylor Slough. But as we view this whole record, conceding defendant's negligence in failing to maintain proper openings in its roadbed, that negligence did not contribute to cause the damage. It was an act of God, an overwhelming flood, for which defendant cannot be held responsible, shown completely by plaintiff's own evidence.

In this view of the case we think the demurrer should have been sustained under this record. It is therefore unnecessary to consider other assignments. If plaintiff can show that water standing over a crop for several days would not destroy that crop, the result would no doubt be different. The cause is reversed and remanded. *Cox, P. J.*, concurs; *Smith, J.*, not sitting.