[1] This is an action for damages alleged to have been caused by the defendant (respondent here) maintaining a high right of way and road bed, and in failing to maintain a culvert sufficiently large to care for the natural drainage, thereby causing the water to back up and destroy plaintiffs' crops and also for permitting water to run through certain boxes underneath its track onto plaintiffs' land and damaging it by washing ditches therein. From a verdict and judgment for defendant, the plaintiffs appeal.
[2] The petition is in three counts. It is long, involved and repetitious but boiled down, it alleges that the defendant railroad constructed and now maintains a right of way and road bed across lands now belonging to plaintiffs, running east and west, and that some distance east of their east line, on other lands, it built a culvert and that underneath the road bed, it built seven small openings, four of which were near the land of plaintiffs, thereby permitting the water to run under the road bed from the north part of plaintiffs' farm to the south part; that the culvert in question was not of sufficient size to take care of natural drainage on plaintiffs' and other lands in the same watershed of approximately 1000 acres. That the railroad right of way was of such height that it impounded and caused the water to back up on 80 acres of plaintiffs' land and drown out their crops for the years 1944, 1945 and 1946. That the openings under its right of way were constructed by the defendant in such a way as to cause water to flow under the right of way and onto plaintiffs' land on the south side of the railroad, thereby creating several ditches and gullies; that plaintiffs were damaged on the north side of the railroad by the crops being drowned out by the impounded waters and on the south side by the formation of ditches and the erosion aforesaid.
[3] Defendant was alleged to have been negligent in (a) maintaining the road bed to such a height as to impound surface and other waters and causing them to back up and cover plaintiffs' land and crops, (b) in failing to construct and maintain lateral ditches on each side of the road bed and right of way leading into and connecting with the existing natural drainage ditches which flow into and through a culvert near the east line of plaintiffs' land, (c) in constructing a culvert near the east line of plaintiffs' land that was not large enough to take care of the natural drainage of waters including surface water, (d) in constructing and maintaining seven small ditches through the road bed and right of way, and under the tracks and "* * * that the water flowing in these ditches is negligently and carelessly allowed and permitted to empty out into and across the land owned by the Plaintiffs on the south side of the right of way and road bed; that because of the failure and negligence on the part of the Defendant to construct and maintain a lateral ditch along the south side of the road bed and right of way, the water from these seven ditches is turned out into the field causing deep ditches and gullies in Plaintiffs' land resulting in permanent and lasting damage to the land", and (e) defendant had negligently allowed the opening under a trestle bridge over Camp Creek west of the culvert to fill up so the natural flow of water down Camp Creek was obstructed causing the water to back up and break out of the defined water courses and flow across plaintiffs' land and into the culvert aforesaid. This last allegation of negligence (e) was not submitted to the jury.
[4] The defendant specifically denied these allegations of negligence on its part and denied that there was any damage to plaintiffs' land or crops due to its acts or negligence. Upon these issues, the cause went to trial with a verdict for defendant.
[5] The evidence on the part of plaintiffs showed that defendant's right of way extended across the south portion of their farm directly east and west, that north of the railroad there was a drainage area or watershed of approximately 800 acres, most of which flowed in a southeasterly direction to a culvert located about 250 feet east of plaintiffs' east line. That because of the elevation of the road bed of defendant and the inadequacy of the small culvert a short *Page 619 
distance east of plaintiffs' east line, the water would back up onto plaintiffs' land north of the road bed and stand, sometimes for hours thereby destroying the crops and that it especially did this in 1944, 1945 and 1946.
[6] Plaintiffs' evidence further showed that plaintiffs and their predecessors had constructed ditches running through the low portion of their land, which was approximately the south and west half of the the 145 acres north of the railroad, leading in a southeasterly direction and that they had constructed another ditch along the right of way fence on their land north of the railroad in an endeavor to drain off the surface water. These ditches converged near the southeast corner of plaintiffs' farm. They were constructed to take care of overflow water from Camp Branch and Goose Creek to the west thereof, this overflow water crossing an adjoining farm and washing several ditches in a north and south road at the west side of plaintiffs' farm rendering this road impassable. Camp Branch and Goose Creek at one time had well defined channels sufficient to hold and convey the waters of their natural drainage area but trees and brush had grown up in and near their channels until they were unable to handle the natural drainage. Parallel with the railroad and one-half mile north is a rock road under which passes three natural streams, their waters converging before arriving at the culvert at the southeast corner of plaintiffs' land. The drainage area or watershed to be serviced by the culvert is approximately 800 acres exclusive of Goose Creek and Camp Branch. The only lateral ditch along the right of way or road bed is the one on the north constructed by the plaintiffs. This lateral ditch is tapped by seven small ditches constructed by defendant and which run under the road bed and tracks, and four of them empty onto the 46 acres of plaintiffs south of the railroad tracks. This 46 acres is immediately south of the east half of the 80 acres lying directly north of the railroad right of way. There is no lateral ditch there to receive and convey this water away so it spreads out across plaintiffs' land, creating ditches and gullies and also causing soil erosion.
[7] Some of plaintiffs' evidence showed that the right of way was as high as two or three feet above the land of plaintiffs both north and south of the railroad right of way. One of plaintiffs' witnesses (Frank L. Clark) testified that about the center of this road bed between the culvert on the east and railroad bridge on the west, the road bed for about one-fourth mile was about level with the land on the north and on the south of it. The plaintiffs' land immediately north of the right of way is practically level and there is not much drainage across it. Some of the plaintiffs' witnesses testified that they had observed the tracks and had seen driftwood and debris that indicated the water had run over the tracks of the railroad and there was sediment lying on and between the ties. The seven small openings under the tracks had become stopped up at the time plaintiffs bought the farm and no water was going through them, but about the middle of 1946, when the road master of defendant railroad stated that he intended to open these seven boxes so water could go through, plaintiff Proctor Keyton told him, "The day you open them boxes, I will sue Hell out of you." The boxes were opened and this suit was immediately filed on July 5, 1946.
[8] Plaintiffs' evidence showed damage to crops on the 80 acres north of the railroad during the years 1944, 1945, and 1946 and also showed that ditches had been washed in the 46 acres lying south of the railroad. Plaintiff introduced 12 photographs tending to substantiate the allegations of their petition.
[9] The defendant's evidence was that on other lands directly west of plaintiffs' north of the railroad, there was a stream known as Camp Branch, which came from a northwesterly direction to within 600 feet of plaintiffs' west line, turned south for some distance then running under the railroad bridge mentioned in plaintiffs' evidence and on in a southeasterly direction, finally turning approximately east; that this was a very crooked stream and that *Page 620 
some short distance north of the railroad trestle, another stream, known as Goose Creek flowed into it; that the channel of Camp Branch, both north of the railroad bridge and south of it was much narrower than the opening underneath the bridge; that both Goose Creek and Camp Branch had been allowed to grow up with brush and trees until its original course was not well defined and that when the rains came, they would overflow their banks north of the railroad and that Camp Branch overflowed its banks on the south of the railroad and this overflow would travel in an easterly direction across plaintiffs' land both north and south of the railroad. The railroad was built in 1881 and plaintiffs bought the land in 1944.
[10] Its evidence further showed that the railroad right of way and road bed in the center of the 3/4 mile stretch between the culvert on the east and railway trestle on the west for 600 or 700 feet was no higher than the land both north and south of it and that when the water stood on plaintiffs' land north of the railroad, it also stood on the railroad and on the land south of it and that the railroad could not have dammed up and held the water as plaintiffs' evidence showed it did. Defendant's evidence also showed that near the culvert the railroad right of way was higher that in the center stretch and was also some higher at the railroad trestle on the west. Defendant's testimony further showed that the water would be six inches deep on plaintiffs' property when the culvert at the east would be only two-thirds full and when the culvert on the east lacked ten inches of being full, the water was running over the road bed under the rails for a distance of 300 or 400 feet. Defendant's evidence also showed that there were no ditches on the south land caused by water going through the seven small outlets under the tracks and some 12 photographs were introduced purporting to show the entire length of the north part of plaintiffs' 46 acres south of the railroad and these photographs did not show any ditches. Witnesses also testified they had inspected this land and that there were no ditches or gullies in plaintiffs' land south of the railroad.
[11] The appellant asserts three reasons why the judgment of the trial court should be reversed: (1) the giving of instruction No. 7 on behalf of defendant, (2) the giving of instruction No. 8, and (3) that the verdict of the jury is against the weight of the evidence. We shall discuss the third point first.
[12] In passing upon the sufficiency of the evidence where the jury has found for defendant, it is our duty to take all of defendant's evidence as true, when not entirely unreasonable, or opposed to physical laws, to give defendant the benefit of all favorable inferences arising therefrom and also such as may arise in its favor from plaintiffs' evidence and to disregard all of plaintiffs' evidence which is in conflict with defendant's or fails to strengthen defendant's contentions. After applying this rule, if there is substantial evidence to sustain the verdict and judgment, we are concluded thereby.
[13] From the foregoing brief resume, there will be observed the usual conflict of evidence and theories presented by the respective parties as to the cause of the alleged damage. Plaintiffs' theory was that the construction of the railroad right of way and road bed formed a dam that impounded water which overflowed their premises and that the defendant negligently failed to construct a culvert sufficient to take care of the water and conduct it into its natural drainage. That it also failed to construct lateral ditches on each side of the road bed to convey the water into natural watercourses.
[14] The defendant's theory and contentions were that their road bed was so low that it could not possibly have impounded the water to plaintiffs' damage and that the culvert was entirely adequate to discharge the normal flow of water into natural watercourses south of the tracks. That plaintiffs' damage, if any, was caused by unobstructed surface water and not by any act or acts of defendant. That the construction of lateral ditches would in no way have kept plaintiffs' land from overflowing. *Page 621 
[15] There was sufficient evidence on each side to justify the submission of their respective theories to the jury.
[16] At the request of the defendant, the court gave the following Instruction No. 7: "The Court instructs the jury that if you believe from the evidence that the damages to the Plaintiffs complained of herein resulted from a general overflow of Camp Branch Creek and Goose Creek and that the same would have done the same damage to the Plaintiffs without regard to the lateral ditches and culvert in question, then your verdict should be for the Defendant."
[17] To this instruction the plaintiffs strenuously object. They contend that it assumes there is no liability for damage caused by overflow water; that it purports to cover the whole case, yet ignores plaintiffs' claim for damage to the land south of the tracks; that it failed to hypothesize facts relative to damage due to the insufficient size of the culvert and that it is confusing and ambiguous because it refers to only one culvert when the evidence shows there were several others.
[18] This was the only instruction attempting to submit defendant's theory that surface water was the sole cause of the damage to plaintiffs' crops; that defendant's railroad track was on the same grade as plaintiffs' land north and south of it, and consequently did not and could not impound said water and cause it to inundate plaintiffs' land; that the failure of defendant to construct the lateral ditches and construct and maintain an adequate culvert to permit the surface water to escape under the railroad and into natural channels did not cause or contribute to plaintiffs' damage; that if said lateral ditches and culvert had been properly constructed and maintained, they would in no way have prevented or diminished plaintiffs' damage and that said damage was not caused by any negligence on the part of the defendant but was solely caused by the surface water, which was in no way obstructed or controlled by the defendant.
[19] There have been many so-called "sole cause" instructions discussed by the appellate courts of Missouri but all of them, so far as we have been able to find, are in cases involving negligence in the operations of motor vehicles, trains or street cars. None has been cited in a case of this character. The underlying principle in the cases on this subject, in Missouri, is that if the injury were solely caused by a third person (or thing) or by the plaintiff and that the defendant's acts or negligence did not cause or contribute to the injury, the defendant could not with justice be held liable. The concept of sole cause is not new and the principle has been applied by juries since the law has recognized tort liability. See Missouri Law Review, Vol. 10, Page 1. The justice of this rule cannot be questioned and it is as applicable to the facts in the case before us as in cases where injuries are sustained in vehicular collisions.
[20] A sole cause instruction must (1) hypothesize the facts upon which the defense is based. Doherty v. St. Louis Butter Co., 339 Mo. 996, 93 S.W.2d 742; State ex rel. Snider v. Shain, 345 Mo. 950, 137 S.W.2d 527, en banc. Bootee v. Kansas City Public Service Co., 353 Mo. 716, 183 S.W.2d 892; but not necessarily those of plaintiffs' theory, Borgstede v. Waldbauer, 337 Mo. 1205, 88 S.W.2d 373, (2) it must negative negligence on the part of defendant either (a) specifically, Borgstede v. Waldbauer, supra, or (b) by reference to other instructions. Doherty v. St. Louis Butter Co., supra; Schlemmer v. McGee, Mo.Sup., 185 S.W.2d 806; Bootee v. Kansas City Public Service Co., supra; Jants v. St. Louis Public Service Co., 356 Mo. 985, 204 S.W.2d 698.
[21] The strictness of these requirements was somewhat relaxed in Rembusch v. Prebe, Mo.Sup., 215 S.W.2d 433, where an instruction was approved in a case involving primary negligence, only, that would have been condemned in a humanitarian negligence submission. However, the instruction there discussed, hypothesized the facts and negatived negligence on the part of the defendant by reference to other instructions.
[22] Instruction No. 7 is a sole cause instruction, and it does not sufficiently *Page 622 
hypothesize the facts nor negative negligence on the part of the defendant. It is so general in its terms as to be little more than an abstract statement of the law. In Long v. Mild, 347 Mo. 1002, 149 S.W.2d 853, 860, Commissioner Hyde, (now judge) speaking for the court about sole cause instructions said: "Of course as an abstract legal proposition, it is correct to say that a plaintiff cannot recover from the defendant if his injuries resulted from his own sole negligence or the sole negligence of a third party who was the driver of the car in which he was riding. However, the mere statement of such an abstract legal proposition does not make a proper jury instruction. As this court said of such an instruction, `the cryptic way in which this information was conveyed to the jury was calculated, not to enlighten, but to confuse.' Boland v. St. Louis-San Francisco R. Co., Mo.Sup., 284 S.W. 141, 145; see also discussion of such an instruction in Peppers v. St. Louis-San Francisco R. Co., 316 Mo. 1104, 295 S.W. 757; Millhouser v. Kansas City Public Service Co., 331 Mo. 933, 55 S.W.2d 673. This is because jurors are not learned in the law, and it is the function of a jury to decide fact issues; they should not be asked to pass upon questions of law. A jury can only understand how to reach a correct general verdict by being told what facts must be found to reach each possible result under the evidence."
[23] The words "general overflow" are not used in the pleadings or in any of the other instructions. The court told the jury that overflow water was surface water but it did not define "general overflow."
[24] The term "surface water" refers to that form or class of water derived from falling rain or melting snow or which rises to the surface in springs and is diffused over the surface of the ground while it remains in that state or condition and has not entered a natural water course. If overflow or flood waters becomes severed from the main current of a natural water course or leaves the same and spreads out over the lower ground (as it did in this case) it becomes and is a part of the surface water. 56 Am.Juris. Secs. 65 and 90. Schalk v. Inter-River Drainage District, Mo.App., 226 S.W. 277; Jones v. Chicago B. Q. R. Co., 343 Mo. 1104, 125 S.W.2d 5; Sigler v. Inter-River Drainage District, 311 Mo. 175, 279 S.W. 50; Harris v. St. Louis-San Francisco R. Co., 224 Mo.App. 455, 27 S.W.2d 1072; Tackett v. Linnenbrink, Mo.App., 112 S.W.2d 160; Morey v. Feltz, 187 Mo.App. 650, 173 S.W. 82.
[25] The terms, "overflow water" and "surface water" are, therefore, not entirely synonymous. The latter is composed of waters not in a defined channel, of whatever kind, while the former may constitute only a small part of the surface water. The evidence in this case showed that during excessive rainfall the channels of Camp Branch and Goose Creek would become full and the water would overflow their banks onto the land of plaintiffs, mingle with the other surface water thereon and inundate their crops. There is no evidence in the record of a "general overflow", but there is much evidence of occasional overflows from the two streams mixing with other surface water and covering part of the plaintiffs' farm, but it was all surface water. Instruction No. 7 does not mention surface water but all the evidence shows it was the cause of the crop damage. If there were damage done to plaintiffs' crops, it was done by surface water composed of both rainfall and overflow water. To use the term "general overflow" of Camp Branch and Goose Creek would only tend to confuse the jury and hypothesize facts not in evidence.
[26] Furthermore, this instruction is confusing and ambiguous when it uses the phrase, "without regard to the lateral ditches and culvert in question * * *." Plaintiffs argue that this instruction is tantamount to a direction to find for the defendant. In other words, (they contend) that it directs the jury to disregard the evidence relating to ditches or culverts but that the jury should find for defendant if they merely found that a "general overflow" from the two creeks caused the damage. They also assert that it wholly ignores any damage sustained by plaintiffs south of the tracks. *Page 623 
It does refer to "the lateral ditches" thereby assuming that there were more than one when the evidence shows that on the south side of the track, no lateral ditch was ever constructed and that on the north side of the track it was constructed by the plaintiffs or previous owners of the land, where one had probably been years ago.
[27] On the other hand, the defendant contends that the instruction clearly and plainly tells the jury that if plaintiffs' crops were damaged by "general overflow" water of the two creeks in question and that the same damage would have been done irrespective of whether defendant had constructed the two lateral ditches or a sufficient culvert, that they should find for the defendant. With this contention we cannot agree. An instruction should be written in such plain and unambiguous language that its meaning would not be confusing to a jury. Furthermore, the high road bed, alleged by plaintiffs to have impounded the water, is not mentioned in the instruction at all. As heretofore stated, this instruction should have hypothesized all the facts necessary to present the defense and negatived any negligence on the part of defendant. For these reasons we must hold the giving of instruction No. 7 was reversible error.
[28] The instructions of the court authorized the jury to return a verdict for plaintiffs for damage to land south of the road for the year 1946. Inasmuch as this case may be tried again, we call attention to the fact that plaintiff, Proctor Keyton, testified that when he bought the land, the boxes or ditches under the track were not open and that they remained closed until the middle of the year 1946. That immediately upon their being opened, he filed this suit (July 5, 1946).
[29] There is no evidence that any water fell upon the land or passed through these openings between the time they were opened and the suit was filed. The most that can be said of the evidence is that sometime during 1946, water passed through the openings and onto the land south of the tracks.
[30] Appellants' second and last assignment of error challenges the giving of the old familiar instruction on the credibility of witnesses. It follows: "The court instructs the jury that if you find and believe from the evidence in the cause that any witness had wilfully sworn falsely to any material matter in this cause, then you are at liberty to disregard the whole or any part of such witnesses' testimony."
[31] The testimony of the witnesses was conflicting as has been shown by the foregoing statement of the facts. When such is the case, it is not error for the trial court, in the exercise of its discretion, to give the above instruction and we must rule this assignment against the appellants. Eisenbarth v. Powell Bros. Truck Lines, 235 Mo.App. 442, 125 S.W.2d 899.
[32] For the reasons stated, the giving of Instruction No. 7, on the part of the defendant, was error and the judgment should be reversed and the cause remanded. It is so ordered.
[33] DEW, P. J., and CAVE, J., concur.
[34] BROADDUS, J., not participating.